Charles **KINEK**, **Steve Konik**, **Ernest Moreno**, **and Steven Yanecko**, **and all persons similarly situated**, **Plaintiffs**,

v.

**GULF & WESTERN, INC.**, **and the Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees**, **Defendants.**

**PENSION BENEFIT GUARANTY CORPORATION**, **Plaintiff**,

v.

**GULF & WESTERN, INC.**, **and the Pension Plan of the New Jersey Zinc Company for Bargaining Unit Employees**, **Defendants.**

Nos. 87 Civ. 6973(LBS), 87 Civ. 7023(LBS).

United States District Court, S.D. New York.

March 18, 1993.

As Amended April 8, 1993.

---

Bredoff & Kaiser, Washington, DC (Julia Penny Clark, Martin S. Lederman, of counsel), Vladeck, Waldman, Elias & Engelhard, P.C., New York City (Seymour M. Waldman, Patricia McConnell of counsel), for Kinek plaintiffs.

Hutton, Ingram, Yuzek, Gainen Carroll & Bertolotti, New York City (Dean Yuzek, Patricia Hewitt, of counsel), for defendants.

Pension Ben. Guaranty Corp., Office of Gen. Counsel, Washington, DC, Carol Connor Flowe, Gen. Counsel, Jeffrey B. Cohen, Deputy Gen. Counsel, Frank D. Allen, Jr., Asst. Gen. Counsel (Sara B. Eagle, Jeffrey J. Altenburg, of counsel), for plaintiff PBGC.

## OPINION

SAND, District Judge.

Prior to September 30, 1981, defendant Gulf & Western Industries, Inc. ("G & W"),

through one of its divisions, operated three facilities located in Palmerton, Pennsylvania; DePue, Illinois; and Odgensburg, New Jersey. G & W maintained a collectively bargained pension plan (the "G & W Plan") which covered employees at these three facilities, as well as employees at seven other facilities. On September 30, 1981, G & W sold these three facilities to Horsehead Industries, Inc. ("Horsehead") which then operated them as the New Jersey Zinc Co. ("NJ Zinc"). At the time of the "spin-off" and in accordance with the asset purchase agreement, G & W transferred to NJ Zinc's pension plan (the "NJ Zinc Plan") those assets and liabilities of the G & W Plan which G & W determined were allocable to the employees who were transferred to NJ Zinc as a result of the spin-off. In total, G & W transferred $1,198,548 from the G & W Plan to the NJ Zinc Plan.

In October 1982, NJ Zinc notified the United Steel Workers of America, AFL–CIO ("USWA"), which represented certain of the employees covered by the NJ Zinc Plan, of its intent to terminate the NJ Zinc Plan "for economic reasons." *See United Steelworkers of America v. New Jersey Zinc Co.*, 828 F.2d 1001, 1003 (3d Cir.1987). Actual termination of the NJ Zinc Plan occurred on January 1, 1983, at which time the Pension Benefit Guarantee Corporation (the "PBGC") became trustee of the plan pursuant to ERISA § 4042(b)(1), 29 U.S.C. § 1342(b)(1). Since the PBGC determined that the Plan's assets were insufficient to provide the benefits that had been promised, the PBGC was required to guarantee payment, from its insurance fund, of certain benefits. *See* 29 U.S.C. § 1322. However, the guaranteed benefits are lower than the benefits that had been promised under the G & W and NJ Zinc Plans. Therefore, many of the Plan beneficiaries have received (and presently continue to receive) benefits from the PBGC which are lower than the benefits they would have received under the G & W and NJ Zinc Plans.

In September of 1987, a class of persons (the "Kinek plaintiffs") who had been vested participants in the G & W Plan as of September 30, 1981—the date of the spin-off—and who thereafter were transferred to NJ Zinc and became participants in the NJ Zinc Plan, brought suit against G & W and the G & W Plan claiming breach of a contractual obligation to fund vested accrued pension benefits fully in the event of an asset transfer or spin-off. The PBGC filed a separate action against the same defendants at approximately the same time. The cases were consolidated for pre-trial purposes.

In 1989 the parties cross-moved for summary judgment on the issue of liability. In a published opinion, this Court held that the Kinek plaintiffs had standing to bring a direct action to collect benefits owed them under the G & W Plan pursuant to § 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B). *Kinek v. Gulf & Western, Inc.*, 720 F.Supp. 275, 278–79 (S.D.N.Y.1989). We also held that the PBGC had standing "to collect any amounts due the plan" pursuant to ERISA § 4042, 29 U.S.C. 1342(d)(1)(B)(ii). *Kinek*, 720 F.Supp. at 280. On the merits, the Court held that two clauses in the G & W Plan—the Full Funding Clause and the Transfer of Assets Clause—obligated defendant G & W to transfer assets sufficient to fully fund the vested benefits of employees that were transferred to Horsehead, *i.e.*, the Kinek plaintiffs. *Id.* at 284. Accordingly, summary judgment was granted in favor of the Kinek plaintiffs. The PBGC was granted summary judgment by this Court in a subsequent, unpublished opinion. *Kinek v. Gulf & Western*, 87 Civ. 6973 (LBS), 1989 WL 156288 (S.D.N.Y. Dec. 20, 1989). The Court did not address—nor was it asked to address—the issue of damages in either of its previous rulings.

The parties agreed by stipulation, dated March 18, 1992, that this Court should determine the amount of G & W's liability on the basis of written submissions. The parties further stipulated that the issues controlling the amount of G & W's liability are:

(a) The appropriate actuarial assumptions regarding participants' expected age of retirement, for use in calculating the sum of money that should have been transferred by defendants to the spin-off pension plan as of September 30, 1981; and

(b) The prejudgment interest, if any, that should be paid on the sum of money by

which the amount that was transferred to the spin-off pension plan as of September 30, 1981, fell short of the amount that should have been transferred.

All parties agree, at least as a matter of theory, that the plaintiffs are entitled to be put "in the same position they would have been in but for G & W's breach." *See, e.g.,* Defs.' Mem. at 3, 15; Kinek Pls.' Mem. at 19; Kinek Pls.' Reply at 2; PBGC's Reply at 3, 8. The parties disagree dramatically, however, as to what amount will accomplish this goal. As an illustration, the defendants' favored formula for computing damages would require them to pay $637,017, plus future non-guaranteed benefits payable when due, directly to the Kinek plaintiffs. Affidavit of Albert J. Kleinberg, Jr., ("Kleinberg Aff.") at ¶ 16.[1] The PBGC's theory of damages would require the defendant to pay $11,298,953.24 directly to the NJ Zinc Plan. PBGC's Mem. at 3. The Kinek plaintiffs' proposed remedy would require the defendant to pay $12,113,-929—$1,060,888 directly to the Kinek plaintiffs, and the remaining $11,053,041 to the N.J. Zinc Plan. Kinek Pls.'s Reply at 9–10.

Therefore this Court must determine, in the specific context of this ERISA proceeding, what amount it would take to put the plaintiffs in the position they would have been in but for the defendants' breach. This case raises complicated questions involving the proper actuarial assumptions to be used to calculate future pension benefits and the availability of prejudgment interest. The factual setting presented by this case is unique, and no party has cited authority directly on point to guide us in our determination.

## I.

### THE STRUCTURE OF THE REMEDY

The plaintiffs and the defendants propose two very different methods to accomplish the goal of putting the plaintiffs in the position

they would have been in absent the defendants' breach. The defendants take the position that they should make direct payment to the Kinek plaintiffs for all past benefits the Kinek plaintiffs have not received (plus interest), and all future, non-guaranteed benefits. The Kinek plaintiffs and the PBGC, on the other hand, propose that the Court calculate the amount that G & W should have contributed to the NJ Zinc Plan on September 30, 1981 (the "Full Funding Amount"), and then add interest at the then-prevailing market rates to that portion of the Full Funding Amount which the defendants in fact did not transfer (the "Shortfall"), to approximate—or attempt to "recreate"—what would have happened had G & W fully funded the NJ Zinc Plan in 1981, as it was contractually obligated to do.[2]

After carefully considering the arguments advanced by the parties, we conclude that the proper measure of damages is the amount that G & W should have transferred to the NJ Zinc Plan in 1981 less the amount which G & W in fact transferred to the Plan at that time. That is, this Court adopts the approach advocated by the Kinek plaintiffs and the PBGC. Before we calculate the sum that the defendants owe to the plaintiffs, we will briefly discuss the defendants' proposal and our reasons for rejecting it.

### A. *The Defendants' Proposal*

Defendants propose that the Kinek plaintiffs are entitled to the following in order to make them "whole": (1) recovery of the difference between the benefits, vested as of September 30, 1981, that the Kinek plaintiffs have received and the benefits they would have received had G & W fully funded the NJ Zinc Plan upon spin-off in 1981; (2) incidental damages at the statutory rate of interest set forth in 28 U.S.C. § 1961; and (3) future benefit payments equal to the benefits the Kinek plaintiffs would have received

---

1. Defendants propose several other damage calculations which are summarized in Exhibit D to the Kleinberg Affidavit, annexed hereto as "Exhibit A."

2. The PBGC argues that the entire Full Funding Shortfall should be transferred to the NJ Zinc Plan. The Kinek plaintiffs contend that a portion

of the Full Funding Shortfall should be paid directly to the Kinek plaintiffs, to compensate all past arrearages, and that the remainder should be paid to the NJ Zinc Plan. We defer, until Part IV, the question of allocation of the award between the Kinek plaintiffs and the NJ Zinc Plan.

had G & W fully funded the NJ Zinc Plan in 1981, less the guaranteed benefits they will continue to receive from PBGC in its capacity as insurer of the NJ Zinc Plan. Defs.' Mem. at 15–20. Defendants propose that G & W could pay these future benefits directly to Kinek plaintiffs on a monthly basis or through the purchase of annuities. *Id.* at 16.

Several aspects of this proposal are unique. First, the defendants propose that payments be made directly to the Kinek plaintiffs, instead of to the NJ Zinc Plan itself. The defendants claim this comports with this Court's holding that the Kinek plaintiffs have standing to seek benefits directly from the defendants. *See Kinek,* 720 F.Supp. at 278–79. They also argue that this is the most direct way to ensure that the Kinek plaintiffs receive their "expectation"— *i.e.,* the full amount of all past, present, and future benefits owed. In other words, defendants believe that their proposal will make the Kinek plaintiffs "whole."

Defendants also believe that the NJ Zinc Plan will be made "whole" under their proposal even though they do not propose to transfer any assets directly to the Plan. Defendants argue that the NJ Zinc Plan is owed only that amount which would enable it to meet all past, present, and future benefits owed to the Kinek plaintiffs. Since, under the defendants' proposal, the Kinek plaintiffs will receive all benefits to which they are entitled, the defendants conclude that the Plan will be owed nothing further.[3] Essentially defendants regard the NJ Zinc Plan as a mere conduit for providing pension benefits to the Plan beneficiaries. Indeed the defendants believe it is a "fiction" to treat the Plan and the Kinek plaintiffs as separate entities, at least for remedial purposes.

A second significant aspect of the defendants' proposal is that it neither reimburses the PBGC for its past outlays of guaranteed benefits to the Kinek plaintiffs nor relieves the PBGC of the burden of making these outlays in the future. Defendants contend that they need not reimburse the PBGC for past or future guaranteed payments because the PBGC made these payments in its capacity of *insurer.* Moreover, defendants argue that the ·PBGC is statutorily barred from seeking reimbursement of the guaranteed benefits from G & W or the G & W Plan. Defendants note that ERISA § 4062, 29 U.S.C. § 1362, authorizes the PBGC, as *guarantor* of the NJ Zinc Plan, to recoup the value of guaranteed benefits only from Horsehead, the employer that terminated the NJ Zinc Plan, and not from G & W. Defendants also note that this Court previously held that PBGC's standing in this suit derives from ERISA § 4042, which only permits the PBGC, in its capacity of *trustee,* to "collect for the plan amounts due the plan." *See* 29 U.S.C. § 1342. Defendants ask that this Court not allow PBGC to recoup from them its guaranteed payments indirectly through § 4042 since it is prohibited from doing so directly by § 4062.[4]

The PBGC concedes that it may not directly collect the value of guaranteed benefits from defendants. PBGC's Mem. at 6. Nor, apparently, does the PBGC deny that it may, as trustee of the NJ Zinc Plan, use a portion of any amount this Court awards to the NJ Zinc Plan to reimburse itself for money it has paid as guaranteed benefits to NJ Zinc Plan beneficiaries over the years.[5] However, the Kinek plaintiffs and the PBGC both maintain that the fact that the PBGC may reimburse itself for guaranteed benefits from any recov-

---

**3.** Stating this same idea slightly differently, defendants note that the PBGC, who sues on behalf of the NJ Zinc Plan in its capacity as Plan trustee, is only entitled "to collect for *the plan* any amounts due the plan," 29 U.S.C. § 1342(d)(1)(B)(ii). After payment has been made directly to the Kinek plaintiffs, there will be nothing "to collect for the plan."

**4.** Defendants contend that the driving engine behind plaintiffs request for a large recovery on behalf of the NJ Zinc Plan is to enable the PBGC, in addition to paying the Kinek plaintiffs' bene-

fits, to recoup the guaranteed benefits it has paid to the Kinek plaintiffs during the past decade.

**5.** *Cf.* Tr. at 28 (counsel for PBGC opines that any overfunding of the NJ Zinc Plan would probably "inure to the benefit of PBGC"); *id.* at 31 (counsel for PBGC suggests that any overfunding would, in part, go to pay for PBGC's expenses).

The Kinek plaintiffs specifically acknowledge that the PBGC may apply some of any recovery this Court awards to the NJ Zinc Fund towards repaying money the PBGC has paid as guaranteed benefits. Kinek Pls.' Reply at 15.

ery obtained "on behalf of the plan" under § 4062 is irrelevant.

The PBGC and the Kinek plaintiffs have other objections to the Defendants' proposed damages formulation. The PBGC argues that the amount owed to the NJ Zinc Plan cannot be equated with the benefits owed by the Plan to the Kinek plaintiffs. First, the PBGC contends that "funding obligations inure to plans, not plan participants." PBGC's Reply at 4. Second, the PBGC points out that G & W never had the obligation to pay the Plan participants directly; on the contrary, its only obligation was, at the time of the spin-off, to fully fund the *NJ Zinc Plan itself.* Finally, the PBGC contends that when the defendants failed to fully fund vested benefits at the spin-off, they created a shortfall in the NJ Zinc Plan that still exists today. The NJ Zinc Plan, according to PBGC, is entitled to be put in the position it would have occupied but for defendants' breach—a result which is not brought about by the direct payment of benefits to the Kinek plaintiffs.[6]

The defendants' proposal is appealing in a number of respects, most notably because it is the most direct way to ensure that the Kinek plaintiffs receive all past, present, and future benefits owed them. Nevertheless, we believe the defendants' proposal suffers from a fundamental flaw: the obligation that G & W assumed, and on which the plaintiffs base their suit, was the obligation to fully fund the *NJ Zinc Plan itself* in the event of a spin-off; G & W never assumed the obligation to pay the Plan participants directly in the event of a spin-off. The parties have stated repeatedly in their submissions, and again at oral argument, that the Court should draw on ordinary principles of contract law to resolve this dispute. Looking to the agreement to which the G & W was bound—the collectively bargained G & W Pension Plan—it is undisputed that G & W was under the obligation, in the event of a spin-off, "to fully fund on a sound actuarial basis all vested benefits currently payable or payable in the future under the eligibility provisions of the Plan in effect at the time of termination." *Kinek,* 720 F.Supp. at 278 (quoting the Full–Funding Clause). In other words, G & W's only obligation was to estimate on September 30, 1981, using sound actuarial principles, the sum that should be transferred to fully fund the Plan on that date. This is the only obligation that this Court will enforce.[7]

■ We do not think that § 4062 of ERISA, which does not allow the PBGC to recoup the value of guaranteed benefits from G & W, requires a different result. We hold today that the G & W is liable to the plaintiffs for the Full Funding Amount (less that amount which G & W in fact transferred after the spin-off) as that amount would have been calculated at the time of the spin-off. It is true that once the Plan is paid this amount, the PBGC may, pursuant to its regulations, use some of the money to reimburse itself for past outlays of guaranteed benefits. However, we do not believe that § 4062 was meant to limit the permissible uses of funds that the PBGC has collected "for the plan" pursuant to § 4042. We therefore reject defendants' creative § 4062 argument in its entirety.

Finally, at several points the defendants have stated that their proposed remedy was the best guarantee that the Kinek plaintiffs would receive their "expectation interest," meaning full pension benefits. We believe that the only possible relevant "expectation interest" any of the parties could have had at the time the agreements giving rise to this lawsuit were entered into was the expectation that G & W would transfer a sum of money to the NJ Zinc Plan on September 30, 1981, and that sum would be invested to enable the Plan to meet future pension obligations.

---

6. PBGC also argues that the Zinc Plan assets must be allocated and distributed in accordance with § 4044 of ERISA, 29 U.S.C. § 1344.

7. Of course, the underlying purpose of G & W's obligation to fully fund the NJ Zinc Plan was to ensure that the Plan would have sufficient assets to enable it to pay all future benefits of those G & W employees who were transferred to Horsehead. However, this does not suggest that G & W was ever under the obligation to pay benefits directly to the Kinek plaintiffs.

## B. *Defendants' Objections to Plaintiffs' Proposal*

As we noted above, the Kinek plaintiffs propose a damage remedy that would attempt to "recreate" what would have happened had G & W fully funded the pension fund in 1981. The plaintiffs' remedy proposes two steps: (1) the Court should determine how much money G & W should have, but did not, transfer to the NJ Zinc Plan on September 30, 1981, to fulfill its contractual obligation to fully fund on a sound actuarial basis all vested benefits; and (2) the Court should recreate the rates of return that the NJ Zinc Plan would have realized on the Full Funding Shortfall during the period between the spin-off and the date of final judgment in this case.

The defendants have several general objections to the structure of plaintiffs' proposal. First, the defendants argue that the plaintiffs' proposal is really specific performance "in disguise" because it would require G & W, thirteen years after the fact, to fully fund the NJ Zinc Plan rather than compensate plaintiffs for the consequence of its breach. The Court believes that this objection is without merit. As we have stated above, the obligation that defendants breached, and the obligation that this Court is enforcing, is the obligation to provide full funding at the time of the spin-off. This case is, in all essentials, no different from the garden variety suit for breach of a sales of goods contract under the Uniform Commercial Code. In such a case, the Court would determine the amount of damages on the date of the breach (as the difference between the contract price and the market price) and then apply prejudgment interest or damages for delay in performance. Plaintiffs claim they are seeking to do essentially the same in this case: *i.e.,* determine the damages on the date of the breach and then apply interest to that factor. We agree.

Defendants also argue that plaintiffs are seeking to recover the profits realized by G & W since 1981 on the monies that it should have transferred to the NJ Zinc Plan on a theory of "unjust enrichment." Defs.' Mem.

36–37. Plaintiffs' contend that they are not seeking this remedy, and therefore defendants' argument is mooted. *See* Pls.' Reply at 13.

To summarize, we conclude that to determine the defendants' liability, this Court must first calculate the Full Funding Amount as that amount would have been calculated at the time of the spin-off. Defendants' liability will be the Full Funding Amount less $1,198,-548—that amount which G & W in fact transferred to the NJ Zinc Plan at the time of spin-off.[8]

We turn next to the two specific issues as to which the parties disagree—the proper actuarial assumptions and pre-judgment interest rate. We will discuss each issue in turn.

## II.

### THE EXPECTED RETIREMENT AGE ASSUMPTION

■ As we have already noted, this Court must determine the amount that G & W should have transferred to the NJ Zinc Plan on September 30, 1981, to fully fund on a sound actuarial basis all vested benefits of the Kinek plaintiffs. The parties agree that in order to determine this amount, an actuary would have calculated the "actuarial present value" of each Plan beneficiary's benefits on September 30, 1981. In other words, the actuary would have estimated the amount of money which, if invested on the spin-off date and increased by interest thereafter earned, would have been sufficient to fund all benefits due in the future.

The parties also agree that to calculate the actuarial present value of each G & W Plan participant's vested benefits on September 30, 1981, an actuary would have considered at least three actuarial assumptions: (1) the beneficiary's expected retirement age ("XRA"); (2) the beneficiary's expected mortality; and (3) an appropriate discount rate. Kinek Pls.' Mem. at 10; PBGC's Mem. at 8; Defs.' Mem. at 78. The only actuarial assumption as to which there is a dispute is the

---

**8.** We defer, until Part IV of this Opinion, the question of allocation of the damage award between the Kinek plaintiffs and the PBGC on behalf of the NJ Zinc Fund.

expected retirement age assumption. Therefore the Court must determine which XRA assumption an actuary would have used in 1981 to calculate the actuarial present value of the Kinek plaintiffs' vested benefits. In making this determination, the Court must avoid the temptation to seek guidance in the 20–20 vision of hindsight, for actuarial assumptions are not based on hindsight, but rather represent the actuary's best judgment as to future events.

The G & W Plan provided that participants could elect to receive benefits before reaching age 65, the "normal" retirement age specified in the Plan. In the usual case, an employee who elects early retirement will receive a reduced monthly pension benefit. However, under the G & W Plan, an employee with at least thirty years of service could retire at any age with a full, unreduced monthly benefit. Both sides agree that the actuarial assumptions used to calculate the present value of vested benefits must account for the possibility that some employees would retire before age 65. They differ, however, as to how to account for this possibility.

The Kinek plaintiffs and the PBGC argue that the Court should use the XRA tables and modes of calculation promulgated by the PBGC.[9] *See* 29 C.F.R. § 2619, Subpart D. Under the plaintiffs' approach, immediate retirement is assumed in the case of a participant who already has attained age 65 *or* accrued 30 or more years of credited service on September 30, 1981 (and who therefore could elect to receive an immediate unreduced benefit). For those participants whose monthly benefits would be reduced if they retired before age 65—because they had not accrued 30 or more years of credited service—the charts in the PBGC regulations

prescribe an XRA that falls somewhere between the earliest age at which a participant could retire, and age 65. *See* Kinek Pls.' Mem. at 11–12. Using this XRA assumption, the Kinek plaintiffs calculate that G & W should have transferred an additional $3,570,734 to the NJ Zinc Plan at the time of the spin-off, while the PBGC calculates this shortfall as $3,518,449. According to the Kinek plaintiffs' actuary, the discrepancy between these two figures is the result of minor differences in methodology. Supplemental Declaration of Claude Poulin ("Poulin Supp. Aff.") at ¶¶ 4–6.

In contrast, the defendants advocate the assumption that Plan employees would retire upon reaching 30 years of service, but not before age 62 or after age 65. Defs.' Mem. at 78. Using this XRA assumption, the defendants calculate the Full Funding Shortfall as $2,611,724. Implicit in the defendants' proposed XRA assumption is the assumption that employees will not retire until age 62 when their retirement would be supplemented by Social Security. Affidavit of Harvey I. Kesselman ("Kesselman Aff.") at ¶ 3.

The plaintiffs bear the burden not only of showing that their proposed XRA assumption is reasonable, but also that it is the assumption that the actuaries would have used in 1981 to calculate the Full Funding Amount. Plaintiffs note that the Internal Revenue Service has deemed the PBGC assumptions "reasonable" for the purpose of calculating the present value of benefits transferred pursuant to a spin off.[10] Although use of the PBGC's XRA tables was not mandatory with respect to the spin-off in 1981, the PBGC's XRA tables were published as interim rules at that time, and thus were available to the parties.[11] This Court con-

9. According to the PBGC, the PBGC's retirement age assumptions are determined using a system of estimated probabilities by PBGC's professional actuarial staff. This system is designed for use in calculating early retirement costs for an entire plan between the extremes that would be obtained if it were assumed either that all participants retire at their normal retirement date or at the earliest retirement age possible under their plan. *See* PBGC's Mem. at 9–11.

10. The defendants do not dispute that the PBGC's XRA assumption is "sound" or "reasonable." Instead, they dispute that the PBGC's

XRA assumption is the *only* "sound" actuarial assumption. While the plaintiffs do not deny that other assumptions may be sound, they do dispute that the defendants have shown that the particular assumption the defendants propose is "sound."

11. The PBGC's XRA tables were published in interim form on January 29, 1981, 46 Fed.Reg. 9492, and were published in final form on April 13, 1982, 47 Fed.Reg. 15780. The interim regulations became effective on April 1, 1981. Pls.' Mem. at 15 n. 12.

cludes that there is a strong likelihood that an actuary making the Full Funding calculation in 1981 would have used the PBGC's XRA tables. We find unconvincing defendants' contrary claim.

Defendants contend that they have the best possible evidence that an actuary calculating the Full Funding Amount in 1981 would have used their XRA rather than the PBGC's: they claim that their proposed XRA assumption was actually used by the parties in 1981 for the purposes of determining the amount of money that G & W would transfer to the NJ Zinc Plan at the time of spin-off. Therefore, defendants argue, there is no need to speculate as to which XRA assumption the actuaries might have used in 1981. Defendants also claim that their assumption is consistent with the retirement experience of the Kinek plaintiffs.

### 1. XRA Assumptions Used at the Time of Spin-off

Although the defendants did not, in connection with the spin-off, transfer assets sufficient to fund fully the vested benefits of the Kinek plaintiffs, they claim that a calculation of the amount that would have been necessary to accomplish full funding was undertaken in 1981 by the actuaries for G & W and Horsehead and that their proposed XRA was used in this calculation. Kleinberg Aff. ¶ 6. As evidence to support this claim, defendants point to contemporary correspondence between the actuaries for G & W and Horsehead—Jack Schechter and Harvey I. Kesselman, respectively—which the defendants claim indicates that their XRA assumption was used to calculate the Full Funding Amount as $3,824,727.[12] Defs.' Mem. at 87–88. Defendants further argue:

> Insofar as actuaries representing both the purchaser and seller in connection with the spin-off agreed on a sound XRA assumption, the soundness of that assumption should be accorded special weight, since the purchaser's interest in calculating as high a transfer amount as possible diverged from the seller's interest in computing as low a transfer amount as possible.

Defs.' Mem. at 89.

The Kinek plaintiffs dispute that these letters had anything to do with the calculation of the asset transfer amount; they claim that the most likely purpose of the correspondence was to obtain a value to be booked on Horsehead's financial balance sheet following the spin-off. Kinek Pls.' Reply at 28. In contrast, the PBGC does not appear to dispute that the defendants used their proposed XRA assumptions at the time of the spin-off, though the PBGC maintains that use of defendants' XRA assumptions would not have been "sound" actuarial practice. PBGC's Reply at 15.

It is helpful to examine this correspondence more closely. The first letter in the series, dated March 31, 1982, is from Mr. Kesselman to Ira Barsky at NJ Zinc. The relevant text of the letter is as follows:

> Dear Ira:
>
> I have spoken to Jack Schechter [G & W's actuary] concerning the value of vested benefits of those employees being spun off to New Jersey Zinc. The value of these benefits as of October 1, 1981 is $6,042,284. The value was based on a 7% interest assumption, the 1971 Group Annuity Mortality Table set back 6 years for females, and the retirement age of the later of age 60 or 30 years of service, but not later than age 65. The amount of assets proposed to be transferred to New Jersey Zinc on account of these liabilities is $1,173,145.
>
> This would produce a net value of unfunded vested benefits of $4,869,139. . . .
>
> Sincerely,
> /s/
> Harvey I. Kesselman, A.S.A.
> Enrolled Actuary

Pls.' Deposition Exhibit 102. The second letter, also from Mr. Kesselman to Mr. Barsky, is dated April 5, 1982:

---

12. Today, the defendants calculate the full funding amount as $3,810,272. Defendants explain the discrepancy between these two figures—$14,455—as the result of "data clean-up." Defs.' Mem. at 88 n. 37.

Dear Ira:

I have spoken with Jack Schechter [G & W's actuary] concerning the value of vested benefits of those employees being spun off to New Jersey Zinc. The value of these benefits as of October 1, 1981 is $3,824,727. The value was based on Pension Benefit Guaranty assumptions as of October 1, 1981. These rates assume an interest assumption of 10.25% for immediate retirements, lower rates for deferred retirements and the UP 1984 Mortality Table. *The retirement age was the later of age 62 or 30 years of service, but not later than age 65.* I feel that these rates are appropriate for purposes of obtaining the value of unfunded vested liabilities to be listed as a liability according to Accounting Opinion No. 16.

The amount of assets proposed to be transferred to New Jersey Zinc on account of these liabilities is $1,173,145. This would produce a net value of unfunded vested benefits of $2,651,582.

Sincerely,

/s/

Harvey I. Kesselman, A.S.A.

Enrolled Actuary

Pls.' Deposition Exhibit 103 (emphasis added).

Obviously in the April 5th letter, the present value of the vested benefits of the Kinek plaintiffs was recalculated using a different set of actuarial assumptions, including the retirement age assumption proposed by the defendants. Although the new calculation resulted in a present value figure which was more than $2 million lower than the present value calculated in the March 31st letter, the amount of assets proposed to be transferred to NJ Zinc on account of this liability did not change.

The third letter, dated April 6, 1982, was from Jack Schechter to Harvey Kesselman.

This letter essentially summarizes the conclusions set forth in the April 5th letter. The text of that letter reads as follows:

Dear Harvey:

This will confirm yesterday's conversation.

The present value of vested accrued benefits for active employees who transferred from G & W to New Jersey Zinc is $3,824,727 as of September 30, 1981. This recognizes the plan amendments effective in August 1981, using PBGC interest and mortality assumptions for plans terminating on September 30, 1981. Retirement is assumed after 30 years of service, though not earlier than age 62 or after age 65.

I am enclosing a listing of accrued benefits for vested employees transferred to New Jersey Zinc....

Sincerely,

/s/

Jack Schechter

Defs.' Deposition Exhibit 2.

This Court does not believe that the correspondence upon which the defendants rely so heavily indicates that the defendants XRA assumption was used to calculate the present value of all vested benefits of the Kinek plaintiffs in order to determine the amount to be transferred to the NJ Zinc Plan. Both the March 31st and April 1st letters indicate that the amount that G & W intended to transfer to the NJ Zinc Plan was $1,173,145. This figure did not change despite significant changes in several of the actuarial assumptions which were used to calculate the present value, as of September 30, 1981, of the transferred benefit liabilities. Obviously, the calculation of the present value of the transferred benefit liabilities that is memorialized in these letters had nothing to do with the parties' calculation of the amount that was to be transferred to the NJ Zinc Plan.[13]

13. Indeed, it appears that if the parties did employ an XRA assumption when calculating the amount to be transferred to the NJ Zinc Plan, it would have been a very different one than the one advocated by the defendant. After examining two documents in the record—Pls.' Exhibit 48 (July 12, 1982 letter from Jack Schechter to Otto C. Horstman, II) and Pls.' Exhibit 48 (Lawrence N. Bader's Actuarial Statement attached to Form 5310 that was submitted to the Internal Revenue Service)—we reach the same conclusion that the Kinek plaintiffs' actuary reached: "the $1,198,548 that was transferred to the New Jersey Zinc Plan [after spin-off] represented only the present value of benefits assigned to plan termination priority category 3 for Horsehead employees." Poulin Supp. Aff. ¶ 15 (quotation omitted). As Mr. Poulin explained:

This category 3 is a reference to a category defined in ERISA Section 4044, 29 U.S.C.

Nevertheless, it is undisputed that the defendants' XRA assumption was used in connection with the calculation of the present value of the transferred benefit liabilities. This is the very task that the defendants would have been required to do in 1981 had they recognized their obligation to fully fund the NJ Zinc Plan at that time. However, the Court agrees with the Kinek plaintiffs that this calculation was done to determine the carry value of the liabilities on NJ Zinc's books rather than to determine the amount of assets G & W was required to transfer to the NJ Zinc Plan. As the April 5th letter clearly indicates, Mr. Kesselman specifically advised Mr. Barsky that the revised assumptions contained in the letter were "appropriate for purposes of obtaining the value of unfunded vested liabilities according to Accounting Opinion No. 16." Pls.' Deposition Exhibit 103. Accounting Opinion No. 16 was the standard then in effect for booking such liabilities on an employer's financial statement following acquisitions and divestitures. Therefore, the question the Court must resolve is whether the use of the XRA assumption advocated by the defendants for the purpose of determining the carry value of the Plan's liabilities on the NJ Zinc's books suggests that an actuary would have used this same assumption to calculate the Full Funding Amount. Although this question is not free from doubt, we believe that it does not. In other words, the Kinek plaintiffs have satisfied us that sound actuarial practice in 1981 would more likely have led to the use of the PBGC's XRA tables.

Defendants argue that their proposed XRA assumption is particularly reliable because it was arrived at after arms' length negotiations between parties with opposing interests: the seller (G & W) who wanted to minimize the transfer amount and the buyer (NJ Zinc) who wanted to maximize it. While this certainly would have been true had the calculation of transferred liabilities been undertaken for the purpose of determining the amount of assets to transfer to NJ Zinc, it is not true here where the calculation was done to determine the carry value of the liabilities on Horsehead's books. Although Horsehead had an interest in arriving at the lowest possible figure of liabilities to be booked on its balance sheet after the sale, G & W had no interest at all in the value that Horsehead assigned to this liability on its books. G & W's only concern was the actual amount of assets and liabilities that were to be transferred. We therefore reject defendants' contentions that their proposed XRA assumption was used in 1981 to determine the amount of assets to transfer to NJ Zinc and that it emerged as the product of arms-length negotiations between two parties with adverse interests. Accordingly, we hold that the PBGC's XRA assumption should be used.[14]

### 2. The Actual Experience of the NJ Zinc Plan

The defendants also claim that their XRA assumption was more "realistic" than those that are advocated by the plaintiffs based on the actual experience of the NJ Zinc Plan which defendants claim reflects the fact that many covered employees were low wage earners more likely to defer retirement until eligible for Social Security. Defendants note that seventy-six class members are known to have retired since the spin-off. Of those

§ 1344, which ranks priorities to be used in allocating the assets of a terminating plan. Since category 3 allocates assets only to those participants or beneficiaries *who were or could have been in pay status as of the beginning of the three-year period ending on the termination date of the plan* (as of September 30, 1978, in the case of this spin-off), these are the only plan participants whose benefits the seller and buyer had to calculate in determining the amount to be transferred to the New Jersey Zinc Plan.

*Id.* (emphasis added).

We believe that there was no need to employ the XRA assumption advocated by the defendants to calculate the value of benefits assigned to plan

termination priority category 3. We also agree with Mr. Poulin that Pls.' Deposition Exhibit 48 indicates that G & W and Horsehead never had to agree on the present value of all vested benefits on a full funding basis to determine the amount to transfer to the NJ Zinc Plan.

14. Defendants also claim that PBGC had the opportunity to review the actuarial assumptions agreed upon by G & W and Horsehead, and did not question their reasonableness at that time. Since we conclude that the defendants' XRA assumption was not agreed upon for use in calculating the Full Funding Amount at the time of spin-off, we also reject this claim.

seventy-six, only seven actually retired before age 62. In fact, the average retirement age of this group of retirees is 62.45 years. Using the defendants' proposed XRA assumption, defendants calculate the assumed retirement age for this group of 76 employees as 62.62 years; using the PBGC's XRA assumption, defendants calculate the assumed retirement age for the same group as 61.51 years. Comparing these calculations to the actual average retirement age of the group, the defendants conclude that their XRA assumption would have been a more accurate predictor of the experience of the NJ Zinc Plan. Defs.' Mem. at 95–96; Kleinberg Aff. at ¶ 14.

We disagree. The task before the Court is to determine which assumptions an actuary would have used in 1981 to determine the Full Funding Amount. Certainly, an actuary in 1981 would not have had the benefit of hindsight to aid in this task. We therefore conclude that consideration of such data is impermissible. In addition, even if we were willing to consider historical data regarding employee retirement, we are not convinced that the statistical difference highlighted in the defendants' brief is significant. Moreover, defendants' statistics look only at a relatively short period of time: given the ages of the Plan participants at the time of the spin-off, the XRA assumption would cover a period beyond 2010. We do not believe that it is reasonable to conclude that these statistics constitute a "retirement pattern" for the Kinek plaintiffs over the entire life of the NJ Zinc Plan.

### 3. The Purchase of Annuities

Finally, defendants claim that they could have purchased annuities for the Kinek plaintiffs at an amount less than the liabilities calculated under the PBGC assumptions, and therefore never would have agreed to fund the NJ Zinc Plan on the basis of the PBGC's XRA assumption. Kleinberg Aff. ¶ 7. We believe that this is nothing more than speculation on the part of defendants' actuary, for an annuity premium quotation was not obtained at the time of spin-off, and the defendants have not offered any objective evidence to support this claim.

### 4. Calculating the Full Funding Amount Using the PBGC's Expected Retirement Age

We therefore conclude that the XRA assumptions set forth in the PBGC's regulations should be used to calculate the Full Funding Amount. As we noted above, using the PBGC's XRA assumption, the Kinek plaintiffs calculate the Full Funding Amount as $3,570,734, while the PBGC calculates the amount as $3,518,449 using that same assumption. According to the Kinek plaintiffs' actuary, the discrepancy between these two figures is the result of minor differences in methodology. Poulin Supp. Aff. at ¶ 4–6. Although Mr. Poulin explains the discrepancy in some detail, we are not provided with sufficient information to determine whether the Kinek plaintiffs' calculation is more reasonable than the PBGC's. Absent the tools with which we can make a principled determination, we will seek common ground and adopt the PBGC's figure, which is the lower of the two. Accordingly, we hold that the defendants should have transferred to the NJ Zinc Plan $3,518,449 and are now liable for that amount.

### III.

### PREJUDGMENT INTEREST

The next issue for the Court to determine is whether prejudgment interest should be awarded to the plaintiffs, and if so, at what rate. Because of the significant impact interest has on the amount the defendants will be required to pay, the parties have briefed the issue thoroughly. The parties conceded at oral argument that the question of whether to award prejudgment interest is a matter within the sound discretion of this Court. *See also Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.) ("ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest"), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *see also Wickham Contracting v. Local Union No. 3,* 955 F.2d 831, 833–36 (2d Cir.) (discussing law of prejudgment interest under sever-

al federal statutes, including ERISA), *cert. denied*, — U.S. —, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). In the exercise of that discretion, we conclude that the proper rate of prejudgment interest is 9.5% per annum— the effective discount rate that is used to determine the extent of G & W's full-funding obligation as of September 30, 1981.

We will begin by exploring the different interest rates proposed by the parties. The Kinek plaintiffs propose that this Court should award a prejudgment interest rate based on what the NJ Zinc Plan would have earned on the money that G & W should have transferred to the Plan on September 30, 1981 (the "Shortfall"). In other words, the Kinek plaintiffs propose that the Court approximate the market rate of interest available to pension plans like the NJ Zinc Plan for the past thirteen years. With regard to the period between October 1, 1981 and December 31, 1992 (the date the NJ Zinc Plan was terminated), the plaintiffs ask the Court to apply the actual investment return rate of the NJ Zinc Plan during that period.[15] For the period beginning on January 1, 1983, plaintiffs claim the Court should estimate the rates of return that the Plan would have

realized had it continued to make investments with the money that G & W should have transferred at the time of the spin-off. The Kinek plaintiffs suggest that the best sources on which to base these estimates are the investment returns reported by pension plans of similar size over the relevant periods. We have set forth the specific rates of return proposed by the Kinek plaintiffs in the margin.[16]

The PBGC agrees with the Kinek Plaintiffs that the rate of interest for the period between October 1, 1981 and December 31, 1982 should be that realized by the NJ Zinc Plan. PBGC's Mem. at 16. However, the PBGC proposes that the interest rate set forth in § 6621 of the Internal Revenue Code, 26 U.S.C. §§ 6601, 6621 (the "6621 rate"), should be used for the period following termination of the NJ Zinc Plan. The PBGC notes that it uses the § 6621 rate to assess interest on all unpaid amounts of plan sponsor liability. *See* 29 C.F.R. § 2622.7(c).[17] The § 6621 rate is based on certain market rates of interest and updated quarterly by the Secretary of the Treasury. Therefore, although the rates proposed by the Kinek

**15.** During this period, the Kinek plaintiffs estimate the rate of return for the NJ Zinc Plan as follows:

| | | |
|---|---|---|
| 10/81 – 12/81 | 16.06% |
| 1/82 – 9/82 | 15.06% |
| 10/82 – 12/82 | 10.55% |

Kinek Pls.' Mem. at 24.

**16.** For the years 1983 through 1986, the Kinek plaintiffs rely on estimates contained in David D. McCarthy & John A. Turner, "Pension Rates of Return in Large and Small Plans", *printed in* U.S. Dep't of Labor, Pension and Welfare Benefits Administration, *Trends in Pensions* 235 (1989) (attached as Addendum A to Kinek Pls.' Mem.). Categorizing the NJ Zinc Plan as a "medium"-sized plan as that term is defined in the study, the Kinek plaintiffs urge the Court to adopt the following average rates of return:

| | | | |
|---|---|---|---|
| 1983 | 12.2% | 1985 | 21.0% |
| 1984 | 10.2% | 1986 | 14.5% |

For the period from 1987–1991, the Kinek plaintiffs claim it is appropriate to use the Employee Benefit Research Institute ("EBRI") figures for rates of return realized by single-employer defined benefit plans during that period. Ki-

nek plaintiffs claim that EBRI informed them that it calculated (but did not publish) the five-year annualized average rate of return for single-employer defined benefit plans for the period of 1987–1991 inclusive as 8.8%. *See* Kinek Pls.' Reply at 7. They ask us to apply that rate of return for 1987–1991.

Finally, for the first two quarters of 1991, EBRI calculates the rate of return for small defined benefit plans as 3.1%. EBRI, *Quarterly Pension Investment Report* (September 1992). "For lack of a better estimate," the Kinek plaintiffs assume that such plans would realize the same 3.1% rate of return over the final two quarters of 1992. Kinek Pls.' Reply at 7. After compounding, the Kinek plaintiffs arrive at an average annual rate of return for 1992 as 6.3%.

**17.** The relevant regulation provides:

The interest rate on employer liability and refunds of employer liability is the annual rate proscribed by section 6601(a) of the Internal Revenue Code of 1954 as amended, and will change whenever the interest rate under section 6601(a) of the Code changes. The interest rate for specified time periods are set forth in Appendix A of this part.

plaintiffs and the PBGC differ, the theory behind those rates is the same: both propose market rates of prejudgment interest to "recreate," as near as possible, what would have happened had G & W transferred the Full Funding Amount on September 30, 1981.

It is no surprise that the defendants take a different approach. First, the defendants propose that the Court use the interest rate set forth in 28 U.S.C. § 1961(a). Noting that by its terms § 1961(a) is applicable to postjudgment interest, defendants point to ERISA cases in which Courts have awarded prejudgment interest at the § 1961(a) rate. *See, e.g., Cefali v. Buffalo Brass Co.,* 748 F.Supp. 1011, 1025 (W.D.N.Y.1990). As of September 17, 1992, the § 1961(a) rate was 3.13%.

The defendants' argue, in the alternative, that if the prejudgment interest rate is not based on § 1961(a), the rate should equal the effective discount rate which is used to calculate the Full Funding Amount. First, the defendants contend that use of the plaintiffs' proposed market interest rates is actuarially unsound because it violates the principle of "symmetry."[18] The defendants also argue that use of a market rate is unfair: since the prejudgment rates proposed by the plaintiffs exceed the overall effective discount rate agreed upon in 1981 by the actuaries for G & W and Horsehead, the defendants contend that use of the plaintiffs' proposed interest rates creates an "excess"—or a "windfall." Defendants contend that neither the Kinek plaintiffs nor the PBGC is entitled to this windfall which results from the use of a discount rate that was too "conservative."

29 C.F.R. 2622.7(c).

**18.** The defendants explain the concept of symmetry as follows:

[I]t is undisputed that the discount rate ... is the best estimate of the actuary ... as to [the] future rate of interest, and that the "purpose" of the discount rate is to select an assumption that will best approximate what is likely to happen in the future. Thus, the discount rate is *intended*—subject to the inability even of actuaries to "see" the future—to be equivalent to the overall effective interest rate at which the full funding amount will grow. Accordingly, [any award of prejudgment interest] must logically equal the discount rate.

As an initial matter, we believe that an award of prejudgment interest is justified, indeed required, in this case because the Plan and the Kinek plaintiffs cannot be made whole without such an award. The reason for this is straightforward: the calculation of the Full Funding Amount explicitly contemplates growth in the future by interest in order to satisfy all future liabilities. If this Court were not to award prejudgment interest—or were only to award the low, statutory rate requested by the defendants—the NJ Zinc Plan would not be placed in the position it would have been in but for the defendants' breach. Therefore, the Court must choose between one of the "market" rates proposed by the plaintiffs or the 9.5% effective discount rate urged by the defendants.

The purpose of an award of prejudgment interest is to ensure that the plaintiffs are put in the position they would have been in absent the defendants' breach. *See also Williams v. Wright,* 783 F.Supp. 1392, 1399 (S.D.Ga.1992) (prejudgment interest awarded in ERISA case where defendant had "received a windfall from the use of the money that rightfully belongs to plaintiff"). The Second Circuit has stated that prejudgment interest is appropriate where such interest is "fair, equitable and necessary to compensate the wronged party fully." *Wickham Contracting,* 955 F.2d at 835. After carefully considering the equities involved, this Court concludes that prejudgment interest should be awarded at 9.5%, the effective discount rate used to calculate the Full Funding Amount.[19]

Defs.' Mem. at 62–63 (citation omitted).
The defendants also argue that if the Court adopts the prejudgment interest rates advocated by the plaintiffs, it should also recalculate the Full Funding Amount using these same interest rates as the discount rate to preserve "symmetry." *See* Scenarios IV and V, Appendix A to this Opinion.

**19.** The PBGC tables in effect in 1981 set an interest rate of 10.5% for immediate annuities; 9.5% for annuities deferred for up to the first seven years; 8.25% for the next eight years of deferment; and 4% for the remainder of the deferment period. Defendants' actuary calculates that the overall effective discount rate used was approximately 9.5%.

Although "[a]warding prejudgment interest in accord with prevailing interest rates is consistent with prior case law," *Katsaros*, 744 F.2d at 281, we are concerned that use of the market rates advocated by the plaintiffs will result in overfunding of the NJ Zinc Plan, and consequently a "windfall" to the plaintiffs. This Court must keep in mind the Second Circuit's recent admonition that "[a]wards of prejudgment interest must not result in over-compensation of the plaintiff." *Wickham Contracting*, 955 F.2d at 834. While it is not entirely clear who would enjoy the benefit of any windfall, it seems likely that it would be the PBGC as trustee for the NJ Zinc Plan. At oral argument, counsel for the PBGC opined that any overfunding of the Plan would likely inure to the benefit of the PBGC, Tr. at 28, or would go, in part, to pay for the PBGC's expenses. Tr. at 31. The Court declines the plaintiffs' invitation to award interest at a rate that will result in overfunding.

Furthermore, the Court believes that the Plan will be sufficiently funded if the 9.5% interest rate is used. The actuaries predicted in 1981 that if the Full Funding Amount was enhanced by an effective interest rate of 9.5%, the Plan would be able to meet all future liabilities. We believe that awarding prejudgment interest at a rate of 9.5% will give the plaintiffs the full benefit of their actuarial predictions, and no more. In other words, an award of prejudgment interest at 9.5% will put the NJ Zinc Plan in the precise position, today, that actuaries in 1981 would have predicted it would be in today.[20]

The plaintiffs argue, with some force, that the discount rates calculated as of 1981 are long-range interest assumptions, intended to apply to the Plan's assets over the entire life of the Plan, until the final beneficiary has ceased to collect benefits, an event that will occur some time in the middle of the next century. The Kinek plaintiffs also note that actual interest rates will fluctuate a great deal, and that these long-range projections will tend to even out the fluctuations over the long term. Even accepting what the plaintiffs say as true, the Court is still persuaded that an award of prejudgment interest at the high 1980s market rates would result in over-funding of the NJ Zinc Plan.[21] Moreover, we note that there remains sufficient time—during the expected life of the Plan—for these "fluctuations" to be leveled out. Ultimately, this Court has not been persuaded that depriving the NJ Zinc Plan of the excess interest it would have earned in the 1980s will, in the long term, effect adversely the Plan's ability to provide all future benefits to beneficiaries. Accordingly, we hold that prejudgment interest should be awarded at 9.5% per annum, a rate that equals the effective discount rate used to calculate the Full Funding Amount.

One final issue regarding interest must be addressed, though only briefly. The defendants claim that prejudgment interest should only run from September 30, 1987, the date on which the Kinek plaintiffs filed this lawsuit. We disagree. As we have stated several times already, we believe that an award of prejudgment interest is required in this case to make the plaintiffs—including the NJ Zinc Plan—"whole." Obviously, if we were to award prejudgment interest only from the date on which this action was filed, the Plan would be underfunded, and thus would not be put in the position it would have been in but for the defendants' breach. Finally we do not believe that *Cefali v. Buffalo Brass Co., Inc.*, 748 F.Supp. 1011 (W.D.N.Y.1990), requires a different holding. In *Cefali*, Judge

---

**20.** This Court does not believe, as the defendants argue, that awarding prejudgment interest at a market rate would be "actuarially unsound." However, in the exercise of our broad discretion, we hold today, on the specific facts of the case before us, that awarding prejudgment interest at the effective discount rate is more appropriate.

**21.** The defendants also argue that if they had fully funded the NJ Zinc plan in 1981, the Plan would have been overfunded and any overfunding might have been "recouped" by Horsehead, the plan sponsor, through a plan termination and

reversion. However, this is just one of many possibilities that might have occurred. For example, excess funding of the Plan might have lead NJ Zinc to amend the Plan so it had the right to reduce the amount of employer contributions while maintaining the same level of benefits. On the other hand, the Plan might also have been amended to provide greater benefits for retirees. In the end, this Court concludes that it is pure speculation whether any of these situations would have occurred.

Larimer, presumably relying on laches, awarded prejudgment interest only from the date on which the plaintiffs had brought suit to collect severance benefits due them. First, we reiterate that the availability of prejudgment interest is within the sound discretion of the district court, and we note that Judge Larimer was exercising his sound discretion in tailoring the prejudgment interest award to the particular facts of that case. In addition, we believe that *Cefali* is readily distinguishable from the instant case because it did not involve suit on behalf of a pension plan itself to collect funds owed to the plan.

### IV.

### ALLOCATION OF AWARD BETWEEN THE PLAINTIFFS

As we have noted earlier, the Kinek plaintiffs and the PBGC disagree as to how the damage award should be allocated.[22] It is the PBGC's position that the defendants should make payment to the NJ Zinc Plan and that the PBGC would then, in accordance with their allocation regulations, pay the Kinek plaintiffs their benefits out of proceeds paid to the Plan. *See, e.g.,* PBGC's Mem. at 7; PBGC's Reply at 4–5. In contrast, Kinek plaintiffs contend that they should receive directly the lost benefits due to them off the top, with the remainder going to the PBGC as trustee of the NJ Zinc Plan. Pls.' Reply at 10 n. 4. In support of their position, Kinek plaintiffs note that this Court granted them standing to bring a "direct action" against the defendants "to collect benefits owed them under the Plan." *Kinek,* 720 F.Supp. at 279. The Kinek plaintiffs also argue that they do not need the PBGC to act as an "intermediary" for them. Kinek Pls.' Reply at 10 n. 4.

Guided by our previous holding that the Kinek plaintiffs have standing to collect benefits directly from the defendants, we conclude that the Kinek plaintiffs are entitled to receive, directly, that amount which compensates them for the portion of past due benefits they have not yet received. The Kinek plaintiffs calculate this amount, accurate through December 31, 1992, as $1,060,888.

**22.** It occurs to the Court that this disagreement

*See* Poulin Supp. Aff. at ¶ 13–14. This figure includes interest at 10.75%. Although we believe that the individual Kinek plaintiffs are entitled to prejudgment interest to compensate them for the delayed payment to them of benefits, we conclude that the Kinek plaintiffs should only receive 9.5% per annum.

After payment is first made to the Kinek plaintiffs, the remainder of the recovery awarded today should be paid to the PBGC as trustee of the NJ Zinc Plan.

### CONCLUSION

As set forth more fully above, we hold today that the proper measure of damages is that amount which the defendants should have transferred to the NJ Zinc Plan on September 30, 1981—*i.e.,* the Full Funding Amount—less the amount which the defendants in fact transferred at the time of the spin-off—$1,198,548. To calculate the Full Funding Amount, the parties must use the expected retirement age assumptions set forth in the PBGC's regulations, in addition to all other relevant actuarial assumptions as to which there is no dispute. Using these actuarial assumptions, we determine that the defendants are liable for $3,518,449.

In addition, we hold that prejudgment interest must be awarded from September 30, 1981—the spin-off date—until the date of judgment, at 9.5% per annum, the effective discount rate which was used to calculate the Full Funding Amount. According to the most recent figures provided by defendants' actuary, the total amount of liability, with interest calculated through September 30, 1992, is $9,547,872. Kleinberg Aff, Exhibit D.

With regard to allocation, we hold that those members of the Kinek plaintiff class who have already retired are to be paid directly a sum which equals the difference between the amount to which they were entitled under the NJ Zinc Plan and the amount which they actually received as guaranteed benefits from the PBGC. In addition, interest is to be awarded at a rate of 9.5% per

may relate to forthcoming fee applications.

annum on any amount payable directly to individual members of the Kinek plaintiff class. After such direct payment has been made, the remainder of the recovery should be transferred to the PBGC as trustee for the NJ Zinc Plan.

The plaintiffs are directed to prepare and present to this Court within twenty-one (21) days a proposed judgment consistent with this Opinion which calculates (1) prejudgment interest through the date of the judgment and (2) the amount of the Kinek plaintiffs' past due benefits through the date of the judgment, plus interest. The proposed judgment should be approved as to form by counsel for the defendants. Postjudgment interest shall be awarded at the statutory rate set forth in 28 U.S.C. § 1961(a) from the date the parties' proposed judgment is signed by this Court until such time as the judgment has been satisfied.

SETTLE ORDER ON NOTICE.

### Appendix A [1]
#### KINEK v. GULF & WESTERN
#### LIABILITY ANALYSIS

| | | G+W Liability | With Prejudgment Interest From 9/30/87 | With Prejudgment Interest From 9/30/81 |
|---|---|---|---|---|
| **SCENARIO I** | | | | |
| Defendants' Theory of Damages, Including Interest [1] Under § 1961(a) | | $562,813, plus future non-guaranteed benefits payable when due by G & W directly or through the purchase of annuities. | $637,017, as of 9/30/92 | $671,449, as of 9/30/92 |
| **SCENARIO II** | | | | |
| The Parties' Respective "Full Funding" Amounts— Resulting From The | a) G+W: | $2,611,724 | $3,046,859 | $ 3,665,747 |
| Different XRA Assumptions of | b) PBGC: | $3,518,449 | $4,104,652 | $ 4,938,402 |
| Plaintiffs and Defendants— Including Interest Under § 1961(a) | c) Kinek: | $3,570,734 | $4,165,648 | $ 5,011,788 |
| **SCENARIO III** | | | | |
| The Full Funding Amounts Grown by The | a) G+W: | $2,611,724 | $4,111,477 | $ 7,087,329 |
| 9.5% Effective Discount Rate Used to | b) PBGC: | $3,518,449 | $5,538,879 | $ 9,547,872 |
| Compute Them | c) Kinek: | $3,570,734 | $5,621,188 | $ 9,689,755 |
| **SCENARIO IV** | | | | |
| The Full Funding Amounts Recalculated | a) G+W: | $1,835,193 | $3,214,074 | $ 6,296,580 |
| by Using a Discount Rate of 11.86% and | b) PBGC: | $2,774,285 | $4,358,757 | $ 9,518,622 |
| Grown at the Same Rate | c) Kinek: | $2,815,512 | $4,930,960 | $ 9,660,071 |
| **SCENARIO V** | | | | |
| The Full Funding Amounts Recalculated | a) G+W: | $1,341,231 | $2,608,582 | $ 5,795,428 |
| by Using a Discount Rate of 14.23% and | b) PBGC: | $2,227,112 | $4,331,546 · | $ 9,623,300 |
| Grown at the Same Rate | c) Kinek: | $2,260,208 | $4,395,915 | $ 9,766,305 |

1. This chart was annexed as Exhibit D to the Kleinberg Affidavit.