**PENSION BENEFIT GUARANTY CORP., Plaintiff,**

v.

**Jerry SOLMSEN, Defendant.**

**No. 85 CV 2083.**

United States District Court, E.D. New York.

Aug. 3, 1990.

Lawrence F. Landgraff, Atty. of Record (Edward MacKiewicz, Gen. Counsel, John H. Falsey, Asst. Gen. Counsel, Lois Bruckner Parks, Trial Atty., and Andrew Stewart, of counsel), Washington, D.C., for plaintiff.

Jerry Solmsen, New York City, defendant pro se.

### MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, Pension Benefit Guaranty Corporation (Guaranty Corp.), a wholly-owned United States government corporation established pursuant to 29 U.S.C. § 1302, brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Guaranty Corp., the successor trustee of the A & S Steel Rule Die Corporation Pension Trust ("the Plan"), alleged that defendant Solmsen, the former president and sole shareholder of A & S Steel Rule Die Corporation ("A & S"), a now defunct corporation, was personally liable under 29 U.S.C. § 1109(a) for breaches of his fiduciary duties with respect to the Plan because of his alleged failure to forward employee and employer contributions to the Plan.

The court, by Memorandum and Order, dated Sept. 16, 1987, familiarity with which is assumed, granted Guaranty Corp.'s motion for summary judgment as to liability

and denied defendant's cross-motions to dismiss and for summary judgment. The court then referred the case to Magistrate Amon for a report and recommendation as to damages.

The magistrate conducted a hearing and issued her report recommending that 1) the Guaranty Corp. be awarded $185,640, the amount of the unpaid contributions when the Plan terminated; 2) interest be allowed from October 18, 1981, the date the Plan terminated to the date of judgment; 3) the interest be at the 52–week Treasury bill rate; and 4) defendant's guaranteed benefits be set off against the award.

Guaranty Corp. objected to the recommendation, arguing that the magistrate had adopted an improper prejudgment interest rate and that the defendant's total accrued benefits, not just guaranteed benefits, should be set off against the award. This court again referred the case to the magistrate.

In February 1990, the magistrate issued a Supplemental Report and Recommendation, recommending that defendant's full accrued benefit be set off against the damage award, and adhering to the recommendation that the court adopt the 52–week Treasury bill rate.

Guaranty Corp. now objects to the use of the Treasury bill rate as insufficient to compensate the Plan for losses suffered by defendant's breach.

## I

The Guaranty Corp. is, as noted, a wholly owned United States Government Corporation, whose Board of Directors consists of the Secretaries of the Treasury, Labor and Commerce. 29 U.S.C. § 1302(d). Its function is to administer and enforce ERISA's Title IV, which includes a mandatory government insurance program protecting the pension benefits of many millions of private sector workers.

When a Title IV plan terminates with insufficient assets to satisfy its pension obligations to employees, the Guaranty Corp. takes over the plan's assets and liabilities and uses those assets to cover, to the extent possible and in accordance with statutory priorities, the benefit obligations. 29 U.S.C. § 1344. The Guaranty Corp. must then add its own funds to ensure payment of some of the remaining "nonforfeitable" benefits, that is, benefits to which participants have earned entitlement as of the termination date.

Employers that maintain pension plans bear most of the cost of the Guaranty Corp. insurance, paying annual premiums. 29 U.S.C. §§ 1306, 1307. Part of the cost is financed by the statutory liability imposed on employers that terminate underfunded pension plans. They become liable to Guaranty Corp. for the benefits it will have to pay out. Historically the Guaranty Corp. has recovered only a small part of the employers' liability, and Congress has had to increase the premiums repeatedly over the years. *See Pension Benefit Guaranty Corp. v. LTV Corp.*, — U.S. ——, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

In the present case, the plan was underfunded and Guaranty Corp. was required to allocate the remaining plan assets and its own funds in accordance with the categories of statutory priorities set forth in 29 U.S.C. § 1344, and 29 C.F.R. § 2618–2618.16. Only three of those categories, namely, 2, 3, and 4, are pertinent here.

Category 2 consists of accrued benefits derived from mandatory employee contributions. This Category is divided into basic-type and non-basic-type benefits. Basic-type benefits are the sum of the present values of the annuity benefit and pre-retirement death benefit. Non-basic-type benefits only apply to participants who have elected a lump sum benefit, and consist of that portion of the lump sum benefit exceeding the value of the basic-type benefit for that participant.

Category 3 consists of those annuity benefits in pay status at the beginning of the three year period ending on the plan termination date, and those annuity benefits that could have been in pay status for participants who were eligible to receive annuity benefits before the beginning of the three

year period ending on the plan termination date.

Category 4 consists of other "basic-type" benefits guaranteed by the Guaranty Corp.

As guarantor of the Plan, the Guaranty Corp. provides the "basic-type" benefits promised by these three Categories whether or not the Plan has sufficient assets to fund those categories. The Guaranty Corp. guaranteed the Plan benefits worth $241,562 in 1981 dollars.

In the present case, had defendant not breached his duty to the Plan, on its date of termination in October 1981 the Plan would have had $185,640 more in funds. The present value of the Plan assets at that time would have totalled $271,234. The administrator would have then paid back or invested the amounts according to the priority categories.

Payments would have first been made to Category 2. There was due $90,317 for basic-type and $75,963 for non-basic-type benefits. Because of the breach, only $85,594 in assets were available. Thus, the beneficiaries did not receive $4723 in basic-type and $75,963 in non-basic-type benefits. As the $75,963 was not guaranteed by the Guaranty Corp., the beneficiaries, absent reimbursement from this action, will not recover the benefits that would have come from these lost assets.

The Guaranty Corp., however, did guarantee $151,245 of basic benefits due under Category 3 and 4 ($241,562 minus $90,317). Even if defendant had fulfilled his fiduciary duty, the Plan assets available for Category 3 and 4 would have only been $104,954 ($271,234 minus ($90,317 plus $75,963)). The $104,954 would not have been sufficient to provide the beneficiaries benefits in excess of those already guaranteed.

In other words, had there been no breach, the beneficiaries would have received from the Plan in 1981 no more than the $75,963, plus the already guaranteed benefits.

## II.

■ Section 1109(a), 29 U.S.C., provides in pertinent part:

any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

Under this Section, the court has "wide discretion" in formulating appropriate equitable relief to put the pension plan in the same position at the time of judgment that it would have been had the breach not occurred. *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). The court may award prejudgment interest to make the Plan whole. *Id.*

The question is what interest rate would approximate the rate of return the Plan would have achieved during the period at issue. In many cases, the courts look to the investment return of the ongoing plan. *See, e.g., See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985). The difficulty in the present case is that the Plan was "terminated" and the assets mingled with those of Guaranty Corp.'s trust fund, which earned an approximately 12% per year return over the period.

The Guaranty Corp. advocates this trust fund rate as the proper prejudgment interest. This was the return the Plan assets arguably earned while in the trust, and was the rate the assets would have earned even had there been no fiduciary breach, as the Guaranty Corp. would still have assumed management of the assets at termination. 29 U.S.C. § 1341(e).

However, the court only has discretion under § 1109(a) to compensate the Plan, not the Guaranty Corp., for lost investment opportunities caused by the breach. The cases cited by Guaranty Corp. do not suggest otherwise. *See Donovan, supra*, 754 F.2d at 1056 (compensating the plan for lost profits); *Dardaganis v. Grace Capi-*

*tal, Inc.,* 684 F.Supp. 1196, 1199 (S.D.N.Y. 1988), *aff'd in part and vacated in part,* 889 F.2d 1237 (2d Cir.1989) (same).

Thus, the court considers what rate would approximate the Plan's return were the Plan considered separate from the Guaranty Corp.'s trust fund.

The court has only the Plan's investment strategy before termination to predict the investments of the hypothetical ongoing Plan. While many funds adopt aggressive investment strategies, with the beneficiaries taking the risks and reaping the rewards or absorbing the losses, this Plan did not. Rather than investing in higher risk and correspondingly higher yield equities or bonds, the Plan bought standard annuities from an insurance company. Neither the Plan nor the beneficiaries would have expected a greater return.

Thus, the appropriate interest rate attributable to the Plan is the return the Plan could have received buying annuities with its assets at the time of termination. Indeed, had the Plan been fully funded, it would have been required to buy annuities from an insurer at the time of termination, 29 C.F.R. § 2617.21, locking in a specific return for the Plan's beneficiaries. This return was less than the return earned by the Guaranty Corp. with its more aggressive investment strategy and much larger pool of assets.

The Guaranty Corp. has calculated its annuity rate, that is, the rate required to provide today the same benefits that could have been purchased in 1981 and cover the Guaranty Corp.'s costs in managing the annuity contracts. This rate is the most equitable prejudgment rate. Any higher rate, including the Guaranty Corp.'s trust fund rate, would more closely estimate Guaranty Corp.'s, rather than the Plan's, lost profits.

Guaranty Corp. further argues that under 29 U.S.C. § 1344(c) the "increase ... in the value of assets" of the Plan after the date of termination is "credited to" the Guaranty Corp., having assumed control of the underfunded Plan. Guaranty Corp. contends that prejudgment interest should be considered interest earned by the Plan

after the date of termination and should be credited to it. In this case, the practical effect of treating prejudgment interest as a post termination "increase ... in the value of assets" is that the beneficiaries of the Plan might not receive lost interest on the non-guaranteed category 2 assets they would have earned had the assets been distributed to them in 1981.

It is hard to see, however, how the Guaranty Corp.—rather than the Plan and beneficiaries—should recover such lost interest. Had there been no breach, it would not have had the assets to invest. In so far as the awarded prejudgment interest rate is required to compensate the Plan and beneficiaries for lost interest on Category 2 benefits, it should not be considered an increase in asset value for purposes of 1344(c).

While Guaranty Corp. will still pay out more in benefits than it has received in Plan assets, this is not attributable to defendant's breach. Absent a breach, the Plan would have still been underfunded.

Guaranty Corp. also notes that several courts in this circuit have adopted as prejudgment interest the adjusted prime rate set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621. *See, e.g., McLaughlin v. Cohen,* 686 F.Supp. 454, 458 (S.D.N.Y.1988); *Whitfield v. Tomasso,* 682 F.Supp. 1287, 1305 (E.D.N.Y.1988); *Benvenuto v. Schneider,* 678 F.Supp. 51, 55 (E.D.N.Y.1988). In those cases, the prime rate approximated those courts' estimates of lost investment returns. As discussed above, this terminated Plan reasonably could have expected only a return approximating the annuity rate.

Finally, Guaranty Corp. argues that because the statute permits it to impose the adjusted prime rate when calculating "employer" liability with respect to payments overdue a plan, *see* 29 U.S.C. § 1362(b); 29 C.F.R. § 2622.7, it is only fair to adopt that rate here. While the adjusted prime rate serves to make it economically unwise for an "employer," usually a corporation, to defer payment to a plan, the same deterrent is hardly required to prevent a fiduci-

 

ary, who may be held personally liable, from violating his fiduciary duty.

The court finds plaintiff's annuity rate to be the equitable prejudgment interest rate.

### III

 The Guaranty Corp. also requests that the defendant's claim to benefits be set off against the judgment. Defendant objects, arguing that such a set-off would violate ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), providing that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."

The remedy of set-off in fiduciary breach cases has been recognized as a narrow exception to the anti-alienation provision. *See, e.g., Crawford v. La Boucherie Bernard, Ltd.*, 815 F.2d 117 (D.C.Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 355 (1987). Defendant relies on *Herberger v. Shanbaum*, 897 F.2d 801 (5th Cir.1990). In *Herberger*, the court rejected the offset remedy as applied to a third party who participated in the fiduciary breach, interpreting the decision in *Guidry v. Sheet Metal Workers Nat. Pension Fund*, —— U.S. ——, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), to preclude such relief.

In *Guidry*, the Court said that it need not decide whether the broad remedial provisions of ERISA, 29 U.S.C. § 1109(a), *supra*, supercede the anti-alienation provision because the defendant there had "not been found to have breached any fiduciary duty *to the pension plans*." 110 S.Ct. at 685 (emphasis in the original). Here there has been such a breach.

The court agrees with the reasoning of *Crawford*. ERISA's legislative history and common sense suggest that set-off is permissible. No good reason appears as to why Guaranty Corp. should have to pay benefits to a person who has wronged the Plan, and the beneficiaries of it, before he has made good the wrong. To the extent *Herberger, supra*, is contrary, this court respectfully declines to follow it.

### IV. Summary

The court adopts the magistrates recommendation entering judgment in the principal amount of $185,640. The court awards prejudgment interest at plaintiff's annuity rate and permits set off of defendant's benefits against the judgment. Plaintiff shall submit an affidavit informing the court of the total damage award and a corresponding order.

So ordered.