Charles KINEK, Ernest Moreno, Steve Konik, Steven Yanecko, Plaintiffs–Appellees,

Pension Benefit Guaranty Corporation, Plaintiff–Appellee–Cross–Appellant,

v.

PARAMOUNT COMMUNICATIONS, INC., Pension Plan of The New Jersey Zinc Company for Bargaining Unit Employees, Defendants–Appellants–Cross–Appellees.

No. 788, 789, Docket 93–6230, 93–6232.

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1993.

Decided April 28, 1994.

As Modified on Denial of Rehearing June 13, 1994.

Marvin E. Frankel, New York City (Michael J. Nassau, Robert E. Payne, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, of counsel), for appellants-cross-appellees.

Jeremiah A. Collins, Washington, DC (Julia Penny Clark, Martin S. Lederman, Bredhoff & Kaiser, Washington, DC, Patricia McConnell, Vladeck, Waldman, Elias & Engelhard, New York City, of counsel), for plaintiffs-appellees.

Jeffrey B. Cohen, Deputy Gen. Counsel, Pension Benefit Guaranty Corp., Washington, DC (Carol Connor Flowe, General Counsel, Frank D. Allen, Jr., Asst. Gen. Counsel, Sara B. Eagle, Jeffrey J. Altenburg, Pension Benefit Guar. Corp., Washington, DC, of counsel), for appellee-cross-appellant.

Before: MESKILL, WINTER and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

The appeals in these consolidated cases principally require us to determine whether, pursuant to the provisions of the pension plan agreement at issue, the defendant employer and the defendant pension plan were obligated to provide full funding of a portion of a single-employer defined benefit pension plan when that portion was "spun off" into a new plan with a different sponsor. On the plaintiffs' summary judgment motions on the issue of liability, the United States District Court for the Southern District of New York, Sand, *J.*, held that the defendants were obligated to fund fully the spinoff by the provisions of the parties' collectively bargained pension plan agreement. *Kinek v. Gulf & Western*, 720 F.Supp. 275 (S.D.N.Y.1989) (*Kinek I*). We affirm the district court's judgment in all respects.

## BACKGROUND

Prior to 1981, defendant Gulf & Western,

Inc. (G & W)[1] operated, through a division, ten facilities engaged in mining, manufacturing and selling zinc oxide and other alloys. A defined benefit plan[2] (G & W Plan) covered all workers in the ten facilities who were members of bargaining units represented by the United Steelworkers of America, AFL–CIO (USWA). USWA had negotiated the G & W Plan, which was subject to the requirements of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001–1461, with G & W, the plan sponsor. *See* 29 U.S.C. § 1002(16)(B)(i) ("plan sponsor" is "the employer in the case of an employee benefit plan established or maintained by a single employer").

At the time critical to these cases, the defendant G & W Plan included two provisions that are relevant here. Section 3.1, the full-funding clause, provided:

> Upon termination of the Plan or upon termination of all the Employer's operations, the Employer will fully fund on a sound actuarial basis all vested benefits currently payable or payable in the future under the eligibility provisions of the Plan in effect at the time of termination.

Section 10.2, the transfer clause, provided:

> Upon the merger or consolidation of this Plan with any other plan or the transfer of assets or liabilities from the Trust Fund to another trust, all Participants shall be entitled to a benefit at least equal to the benefit they would have been entitled to receive had the Plan been terminated in accordance with Section 10.3 immediately prior to such merger, consolidation or transfer of assets or liabilities.

The transfer clause substantially mirrors section 208 of ERISA, 29 U.S.C. § 1058 (section 208), which provides:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated). The preceding sentence shall not apply to any transaction to the extent that participants either before or after the transaction are covered under a multiemployer plan to which subchapter III of this chapter applies.

On September 30, 1981, G & W sold three of the ten facilities to Horsehead Industries, Inc. (Horsehead), which subsequently operated the three facilities under the name The New Jersey Zinc Co., Inc. (NJ Zinc). Certain employees in the USWA bargaining units at the three facilities were transferred from G & W to Horsehead. Horsehead also acquired all of the assets and liabilities of the G & W Plan allocable to the transferred employees. At the time of this "spinoff," which is defined as "the splitting of a single plan into two or more plans," 26 C.F.R. § 1.414(l)–1(b)(4), the spun off portion of the G & W Plan was allegedly underfunded.

With the assets of the spun off portion of the G & W Plan, approximately $1.2 million, Horsehead sponsored a new defined benefit plan, the New Jersey Zinc Co., Inc. Pension Plan for Bargaining Unit Employees Effective As of October 1, 1981 (NJ Zinc Plan). In October 1982, NJ Zinc announced its intent to terminate the NJ Zinc Plan. The Plan was terminated effective January 1, 1983, in accordance with ERISA section 4042(b)(1), 29 U.S.C. § 1342(b)(1),[3] with an alleged $3.5 million shortfall.

---

**1.** After the plaintiffs had filed these actions, G & W became known as Paramount Communications, Inc. For convenience, we will refer to this party as G & W, as did the district court.

**2.** A "defined benefit plan" is "a pension plan other than an individual account plan." 29 U.S.C. § 1002(35). An "individual account plan" is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contribut-

ed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

**3.** In 1986, Congress enacted the Single Employer Pension Plan Amendments Act of 1986 (SEPPAA), Pub.L. No. 99–272, 100 Stat. 237, thereby amending 29 U.S.C. § 1342 and other sections of ERISA. With these amendments, Congress

Because the NJ Zinc Plan was underfunded at the time of its termination, the Pension Benefit Guaranty Corporation (PBGC), the plaintiff in one of the cases now consolidated before us, became trustee of the Plan. *See* 29 U.S.C. § 1342. A wholly owned United States government corporation modeled after the Federal Deposit Insurance Corporation, the PBGC guarantees to participants in covered plans, *see* 29 U.S.C. § 1321(a), payment of most "nonforfeitable benefits," benefits for which plan participants have satisfied the conditions for entitlement under the plan or under ERISA, *see* 29 U.S.C. § 1301(a)(8); 29 U.S.C. § 1322(a), (b); *see also Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 636–38, 110 S.Ct. 2668, 2671–72, 110 L.Ed.2d 579 (1990). *See generally* 29 U.S.C. §§ 1301–1348 (subchapter of ERISA pertaining to the PBGC). The PBGC has paid some benefits to the NJ Zinc Plan's participants, but those participants were entitled to greater benefits from the NJ Zinc Plan than they have in fact received.

The plaintiffs in the other case now consolidated before us are members of a class of persons who were vested participants in the G & W Plan prior to the spinoff and who subsequently became participants in the NJ Zinc Plan. These plaintiffs, to whom we shall refer as the Kinek plaintiffs, allegedly lost or will lose pension benefits as a result of the spinoff.

After the termination of the NJ Zinc Plan, USWA sued NJ Zinc, contending that NJ Zinc had a contractual obligation to fund fully the NJ Zinc Plan upon its termination. Specifically, USWA argued that NJ Zinc was bound by the full-funding clause, section 3.1, in the G & W Plan. This claim was unsuccessful. *See United Steelworkers v. New Jersey Zinc Co.*, 828 F.2d 1001, 1008–10 (3d Cir.1987).

The Kinek plaintiffs subsequently sued G & W and the G & W Plan, alleging that the defendants were obligated to fund fully the spun off portion of the G & W Plan as of September 30, 1981. The Kinek plaintiffs' amended complaint asserted three causes of action: (1) pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, the Kinek plaintiffs claimed that the defendants had violated a contract between an employer and a labor organization by failing to provide full funding of all vested benefits upon the spinoff, (2) pursuant to ERISA section 502, 29 U.S.C. § 1132, the Kinek plaintiffs claimed that the defendants had violated the pension plan by failing to provide full funding of all vested benefits upon the spinoff, and (3) pursuant to section 208, the Kinek plaintiffs claimed that the defendants had violated ERISA by failing to provide full funding of the spun off portion of the G & W Plan.

The PBGC filed suit against the defendants shortly thereafter. In its complaint, the PBGC asserted *inter alia* that, pursuant to ERISA section 4042(d)(1)(B)(ii), 29 U.S.C. § 1342(d)(1)(B)(ii), it is entitled, as trustee of the NJ Zinc Plan, to collect amounts owed by the defendants to the NJ Zinc Plan. The PBGC also asserted several other claims that either are not relevant here or were dismissed by the district court for lack of standing. *See Kinek I*, 720 F.Supp. at 279–81.

The district court consolidated the cases for pretrial purposes and granted, on cross-motions for summary judgment, the plaintiffs' motions for summary judgment on the issue of the defendants' liability. *Kinek v. Gulf & Western*, Nos. 87–6973, 87–7023, 1989 WL 156288, at 1–2, 1989 U.S.Dist. LEXIS 15180, at *5–*6 (S.D.N.Y. Dec. 20, 1989) (*Kinek II* ); *Kinek I*, 720 F.Supp. at 284. The district court read sections 3.1 and 10.2 of the G & W Plan together to require the defendants to fund fully the spun off portion of the Plan. It noted that this contractual full funding obligation was not inconsistent with ERISA, which establishes only a floor for pension benefits and does not prohibit employers from undertaking greater funding obligations. *See Kinek I*, 720 F.Supp. at 283 & n. 5.

sought *inter alia* "to provide for the transfer of unfunded pension liabilities onto the single-employer pension plan termination insurance system *only* in cases of severe hardship." 29 U.S.C. § 1001b(c)(4) (emphasis added) (declaration of policy). Unless otherwise indicated, all references to 29 U.S.C. § 1342, as well as to other ERISA provisions, will be to the preamendment version, which is applicable here.

In a subsequent proceeding on the issue of damages, the district court determined that, in order to discharge their liability, the defendants must pay a lump sum of $3,518,449 plus prejudgment interest of 9.5 percent dating from September 30, 1981, the effective date of the spinoff. *Kinek v. Gulf & Western,* 817 F.Supp. 353, 368 (S.D.N.Y.1993) (*Kinek III* ). The court determined that imposition of prejudgment interest was necessary because the calculation of the amount of the funding shortfall had contemplated interest growth in the future. The district court also ordered that the full amount of the defendants' payment, which totaled $10,009,259 plus postjudgment interest of 3.37 percent, be remitted to the PBGC so as to allow the PBGC to pay the Kinek plaintiffs the difference between what they had received to date and what they should have received, and also to allow the PBGC to retain the remainder for future distribution. *See Kinek v. Gulf & Western,* Nos. 87–6973, 87–7023, 1993 WL 229012, at 1–2, 1993 U.S.Dist. LEXIS 8478, at *1–*5 (S.D.N.Y. June 23, 1993) (*Kinek IV* ).

The principal issue raised on appeal is whether the defendants were obligated, pursuant to sections 3.1 and 10.2 of the G & W Plan, to fund fully the spun off portion of the Plan. Also at issue are: (1) the defendants' contention that the district court abused its discretion in awarding the plaintiffs a lump sum, payable to the PBGC, for past and future benefits, rather than requiring the defendants to make a lump sum payment for past due benefits and to make periodic payments as future benefits become due, payable to the Kinek plaintiffs, and (2) the PBGC's contention on cross-appeal that the district court abused its discretion in imposing prejudgment interest at a rate of 9.5 percent, rather than at the higher actual rate of return, for the period commencing with the spinoff on September 30, 1981, and ending with the termination of the NJ Zinc Plan on January 1, 1983. We address these contentions *seriatim.*

## DISCUSSION

█ We review *de novo* the district court's grant of summary judgment. *Moller*

*v. North Shore Univ. Hosp.,* 12 F.3d 13, 15 (2d Cir.1993); *Lefkowitz v. Arcadia Trading Co. Benefit Pension Plan,* 996 F.2d 600, 602 (2d Cir.1993). The fashioning of relief and the assessment of prejudgment interest, however, are committed to the district court's sound discretion, and we will therefore review such matters only for an abuse of discretion. *See Mendez v. Teachers Ins. & Annuity Ass'n and College Retirement Equities Fund,* 982 F.2d 783, 790 (2d Cir.1992); *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

### I. *Defendants' Full Funding Obligation*

█ We note preliminarily that the district court grounded its finding of the defendants' liability solely in the provisions of the G & W Plan, with some reference to general principles underlying ERISA. The district court concluded that, having found contractual liability on the part of the defendants by applying rules of contract construction, there was no need to reach the issue of whether section 208 also supported plaintiffs' interpretation of the contract. *Kinek I,* 720 F.Supp. at 284 n. 6. On appeal, however, the defendants contend that the district court's contractual interpretation is flawed insofar as it is inconsistent with section 208, which section 10.2 mirrors, and that this inconsistency is demonstrated by regulatory and other guides to interpreting section 208. Accordingly, we will consider not only the issue of how the two contractual provisions, sections 10.2 and 3.1 of the G & W Plan, interrelate, but also the issue of whether section 208 is inconsistent with the district court's contractual interpretation.

The defendants assert several arguments on appeal in support of their contention that the district court erred in determining that they were obligated to fund fully all vested benefits of the Kinek plaintiffs at the time of the spinoff. Some of these arguments relate strictly to the interpretation of the provisions of the G & W Plan; others relate to the interpretation of section 208. None of these arguments, however, is persuasive.

█ The defendants' lead argument on appeal relates to the parties' intent with re-

spect to section 10.2 and its interrelationship with section 3.1. Specifically, the defendants contend that when sections 10.2 and 3.1 were added to the G & W Plan, the parties' understanding of the obligations imposed, as well as their conduct since then, demonstrate that the plaintiffs did not believe that those contract provisions obligated the defendants to fund fully the spun off portion. The plaintiffs counter that the parties simply did not consider the impact of reading sections 3.1 and 10.2 in conjunction and that the particular facts giving rise to these cases were never considered.

Extrinsic evidence regarding the parties' intent is relevant, however, only if the contract is ambiguous. See Sanchez v. Maher, 560 F.2d 1105, 1108 (2d Cir.1977). (where contested contract provision is unclear, parties may submit extrinsic evidence to aid the court in its interpretation of the provision); cf. Ocean Transp. Line v. American Philippine Fiber Indus., 743 F.2d 85, 90 (2d Cir. 1984) (considering evidence of the parties' practical interpretation of the contract where the contract was not clear). Because we conclude that sections 10.2 and 3.1 are unambiguous, any facts about the parties' intent are immaterial.

Indeed, the plain language of the two provisions, taken together, establishes the defendants' obligation to fund fully the spun off portion. Section 10.2 provides that, as of the time of a transfer of assets or liabilities, such as a spinoff, plan participants become entitled to that which they would have been entitled to receive in the event of a termination prior to the transfer. Section 3.1 requires that, in the event of a plan termination, plan participants are entitled to full funding of vested benefits. Because the participants would thus have been entitled to full funding of vested benefits if the plan had terminated before the spinoff, they were entitled to full funding of vested benefits as of the time of the spinoff.

■ In any case, the defendants do not seem to dispute seriously that sections 10.2 and 3.1, when read together, require full funding of the spun off portion. Rather, the defendants focus their attention on their claim that the two provisions should not be read together and that, when read in isolation from section 10.2, section 3.1 is triggered *only* in the event of an actual termination or cessation of all operations, neither of which occurred here. See also Kinek I, 720 F.Supp. at 282 ("[t]he dispute centers on whether or not sections 3.1 ... and 10.2 ... of the G & W Plan should be read together"). The defendants' attempt to read sections 3.1 and 10.2 in isolation is, however, inconsistent with well established principles of contract construction, which require that all provisions of a contract be read together as a harmonious whole, if possible. See, e.g., Enercomp, Inc. v. McCorhill Publishing, 873 F.2d 536, 549 (2d Cir.1989) (rejecting appellants' construction of contract as "somewhat at odds with the agreement as a whole"); see also Rothenberg v. Lincoln Farm Camp, 755 F.2d 1017, 1019 (2d Cir.1985); Restatement (Second) of Contracts § 202(2). Here, sections 10.2 and 3.1 are not inherently inconsistent nor mutually exclusive and can be read together harmoniously, as the district court read them. Furthermore, it is irrelevant that the respective provisions were added to the contract at different times; it is significant only that the two provisions were both part of the pension plan agreement at the time of the spinoff. Accordingly, we conclude that sections 10.2 and 3.1 are properly read together to require the defendants to fund fully the spun off portion of the G & W Plan.

The defendants also argue, however, that reading sections 10.2 and 3.1 together yields an outcome that is inconsistent with regulatory and other guides to the interpretation of section 208, on which section 10.2 is modeled. We are not persuaded.

The defendants assert that, in the event of a spinoff, section 208 merely requires allocation of *extant* fund assets in accordance with the priority rules of ERISA section 4044, 29 U.S.C. § 1344, and does not require any *additional* funding that would be required in the event of termination. They argue that the limited purpose of the hypothesized termination in section 208 is to invoke section 4044's priority rules. The alleged authority for this view is a regulation issued by the Treasury Department interpreting Internal

Revenue Code section 414(*l*), the tax counterpart of section 208. The Treasury Secretary, rather than the Labor Secretary, has authority for issuing regulations interpreting section 208. *See Hurwitz v. Sher,* 982 F.2d 778, 779 n. 1 (2d Cir.1992) (citing Reorganization Plan No. 4 of 1978 § 101, 3 C.F.R. § 332 (1978), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 9814), *cert. denied,* —— U.S. ——, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993). The regulation on which the defendants rely, 26 C.F.R. § 1.414(*l*)–1(a)(2), provides in pertinent part:

> A trust which forms a part of a plan will not constitute a qualified trust ... unless, in the case of ... a transfer of assets or liabilities ... each participant receive[s] benefits on a termination basis ... from the plan immediately after the ... transfer which are equal to or greater than the benefits the participant would receive on a termination basis immediately before the ... transfer.

The defendants assert that this regulation makes clear that, when a transfer of assets or liabilities occurs, as in a spinoff, the spun off portion of the plan must be funded only to the extent that "benefits on a termination basis" are provided. Such benefits are defined in 26 C.F.R. § 1.414(*l*)–1(b)(5)(i) as "the benefits that would be provided exclusively by the plan assets pursuant to section 4044 of [ERISA, 29 U.S.C. § 1344] and the regulations thereunder if the plan terminated[, but not] benefits that are guaranteed by the Pension Benefit Guaranty Corporation." The defendants thus contend that all that section 208 requires in the event of a spinoff is funding of the spun off portion of the plan

in the amount that is provided by existing plan assets, allocated according to the priority rules of ERISA section 4044, 29 U.S.C. § 1344.

█ This interpretation of the obligations imposed by section 208, which we assume, without deciding, is a valid interpretation,[4] does not, however, undermine our interpretation of the defendants' contractual funding obligations. Indeed, our contractual interpretation, under which the defendants must provide full funding of the spun off portion of the G & W Plan, would be inconsistent with section 208 only if the term "plan assets" in section 1.414(*l*)–1(b)(5)(i) means existing plan assets and prohibits the funding of benefits with assets that are added to a plan in accordance with a contractual full funding obligation. Even assuming that "plan assets" means nothing more than existing plan assets, the regulations cannot be read to prohibit that which they do not require. It is well established that ERISA provides merely a floor for benefits, not a ceiling. A contractual provision like section 3.1 of the G & W Plan, which requires additional funding, therefore constitutes a permissible supplement to the minimum standards mandated by ERISA. *See, e.g., Pension Benefit Guaranty Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1200 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *United Steelworkers,* 860 F.2d at 197; *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Keystone Consol. Indus.,* 793 F.2d 810, 813 (7th Cir.), *cert. denied,* 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986).

---

**4.** We need not decide whether section 208 itself, in the absence of the pertinent provisions of the G & W Plan, would require full funding of vested benefits that have been spun off because the plaintiffs do not make that argument. On that issue, compare *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1147 (3d Cir.1993) (defendant employer, who sponsored a defined benefit plan, may transfer liability for early retirement benefits to another employer, to whom defendant sold a division of its operations, but defendant must also transfer sufficient assets to fund those benefits), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994), *Koch Indus. v. Sun Co.,* 918 F.2d 1203, 1207 (5th Cir.1990) ("section 208 requires that employers also transfer sufficient

plan 'assets' to pay previously promised benefits to employees as they come due"), and *Bigger v. American Commercial Lines,* 862 F.2d 1341, 1345 (8th Cir.1988) ("[a]s the language in [section 208] clearly states, original sponsors of defined benefit plans are required to transfer only sufficient assets to provide for the benefits earned as of the date of the spinoff," but need not allocate excess assets to the spun off plan), with *United Steelworkers, Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 199 (6th Cir.1988) ("ERISA does not require that assets be equivalent to liabilities at the time of transfer, only that the transfer is not used as an excuse to undercut the funding of a protected plan").

The defendants further contend that several district court cases interpreting section 208 support their position. *See Malia v. General Elec. Co.,* No. 91–1743 (M.D.Pa. Aug. 10, 1992); *In re Gulf Pension Litigation,* 764 F.Supp. 1149 (S.D.Tex.1991); *Van Orman v. American Ins. Co.,* 608 F.Supp. 13, 25 (D.N.J.1984). These cases generally hold that section 208 does not entitle pension plan participants to surplus assets in the event of a plan merger, even though they may have been entitled to those surplus assets in the event of a termination. Because each of the cases involves a merger of pension plans, rather than a spinoff, as occurred here, however, they are not particularly supportive of the defendants' contention. The distinction is significant because mergers are subject to different regulations than spinoffs. Indeed, the Treasury regulation applicable to mergers, 26 C.F.R. § 1.414($l$)–1(e)(1), requires full funding of all accrued benefits upon merger: "[i]f the sum of the assets of all plans is not less than the sum of the present values of the accrued benefit (whether or not vested) of all plans, the requirements of [I.R.C.] section 414($l$) will be satisfied merely by combining the assets." 26 C.F.R. § 1.414($l$)–1(e)(1). In light of the defendants' argument that there is no full funding requirement for spinoffs, under either the contract or section 208, it is clear that, at best, mergers and spinoffs are subject to different regulatory requirements and, therefore, cases involving mergers are not necessarily useful in spinoff cases. At worst, from the defendants' perspective, mergers and spinoffs would be subject to the same regulatory requirements and section 1.414($l$)–1(e)(1) would make clear that section 208 itself required full funding upon the spinoff. Accordingly, the cases the defendants cite give us no reason to believe that our contract interpretation is contrary to ERISA.

In any case, even if these cases were apposite here, we would reject their suggestion that the district court's contractual interpretation is at odds with section 208. We read section 10.2 of the G & W Plan, which is substantially similar to section 208, to provide unambiguously that plan participants are entitled, in the event of a spinoff, to what they should have received in the event of an actual termination. Nothing in these cases persuades us otherwise.

■■■ The defendants next cite certain actuarial information that they contend supports their view that the district court's contract interpretation is inconsistent with ERISA. *See, e.g.,* "Mergers and Spinoffs," *1989 Enrolled Actuaries Meeting* 171. Even assuming that the actuarial advice relied on by the defendants is an authoritative source, that advice is irrelevant here because it relates only to what section 208 *requires* alone and in conjunction with the amended section 4041, 29 U.S.C. § 1341.[5] The advice does not relate to the question of whether section 208 *prohibits* the operation of the full funding requirement imposed by section 3.1 in the event of a spinoff. Accordingly, the actuarial advice does not aid the defendants.

Finally, the defendants assert that the district court's contract construction is improper because it will anomalously necessitate the full funding of the entire G & W Plan, including the portion that was not spun off, as of September 30, 1981. The difficult issue of

---

5. We reject the defendants' contention that our construction of section 3.1 of the G & W Plan will have significant implications in the construction of the current version of ERISA section 4041(a) and (b)(1)(D), 29 U.S.C. § 1341(a) and (b)(1)(D), which was amended in 1986 by SEPPAA, *see* footnote 3, and which the defendants contend essentially codifies section 3.1. The amended section 4041 requires any plan that is to be terminated to submit to the PBGC actuarial and other information that will allow the PBGC to determine whether the plan is sufficient for benefit liabilities. 29 U.S.C. § 1341(b)(2)(A) (as amended). If the PBGC determines that a plan is not sufficient for benefit liabilities, the result is not, as the defendants seem to suggest, that the

plan must then be fully funded. Rather, the PBGC may either proceed with a distress termination pursuant to ERISA section 4041(c), 29 U.S.C. § 1341(c), institute involuntary termination proceedings under ERISA section 4042, 29 U.S.C. § 1342, or simply refuse to allow termination and thereby require the plan to continue. Moreover, our reading of the amended section 4041 is shared by the PBGC, which is charged with administering this provision and is entitled, therefore, to deference in its reasonable interpretation of it. *See LTV Corp.,* 496 U.S. at 647–48, 110 S.Ct. at 2676–77; *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

whether the defendants must fully fund the entire G & W Plan is, however, well beyond the scope of the issues that were addressed by the district court and fully briefed by the parties on appeal. We decline, therefore, to answer that question and hold narrowly that the defendants must fully fund the spun off portion of the G & W Plan. For similar reasons, we do not address the defendants' corollary argument concerning the application of the contractual full funding requirement in the event of a partial termination of the G & W Plan.

To summarize, we conclude that section 10.2 of the G & W Plan, read together with section 3.1, requires the defendants to fund the spun off portion to the extent that would have been required in the event of an actual termination. Because the G & W Plan called for full funding upon actual termination, full funding was also required at the time of the spinoff that occurred in these cases. This result is not inconsistent with section 208 or the pertinent regulations. We therefore affirm the district court's finding as to the defendants' liability.

## II. *Form of the Award*

The defendants next assert a multifaceted attack on the district court's order that the defendants pay the damages award in one lump sum to the PBGC. The defendants challenge both the lump sum nature of the award and the payment of it to the PBGC, rather than to the Kinek plaintiffs. The defendants contend that the award is inconsistent with the Kinek plaintiffs' contractual entitlement, if any, and with the Kinek plaintiffs' theory of standing. The defendants also assert that the PBGC has no standing at all as trustee of the NJ Zinc Plan to sue them. We are not persuaded.

■ The district court carefully considered the two competing proposals posited by the parties as to the form of the award: first, the defendants' proposal that they pay directly to the Kinek plaintiffs both (a) the difference between what the Kinek plaintiffs had received to date and what they would have received if the spun off portion of the G & W Plan had been fully funded, and (b) future benefits, by making direct monthly payments as the benefits become due or by purchasing annuities; and, second, the plaintiffs' proposal that the defendants pay a lump sum for all past and future benefits. *Kinek III*, 817 F.Supp. at 358–59. The district court adopted the plaintiffs' proposal on the ground that the defendants' contractual obligation had been to fund the NJ Zinc Plan, not to pay the Kinek plaintiffs directly. Because it was that contractual obligation that the defendants had breached, the district court concluded, the appropriate remedy was to order the defendants to pay the PBGC the amount of the spun off portion's funding shortfall as of September 30, 1981. *Kinek IV*, 1993 WL 229012, at 2, 1993 U.S.Dist. LEXIS 8478, at *3–*4; *Kinek III*, 817 F.Supp. at 359. This determination was not an abuse of discretion.

First, the district court properly concluded that the wrong committed by the defendants was the breach of an obligation to fund fully the spun off portion of the G & W Plan at the time of the spinoff, and that the appropriate remedy for this wrong was an order to fund fully that portion as of September 30, 1981. *Kinek III*, 817 F.Supp. at 359. The defendants' obligation follows clearly from the pertinent language of section 3.1: "the Employer will fully fund … all vested benefits." This provision thus called for the defendants to transfer to the NJ Zinc Plan not just existing plan assets allocable to the Kinek plaintiffs, but also the additional assets necessary to fund fully the transferred liabilities allocable to the transferred employees.

The defendants contend, however, that because section 10.2 provides the Kinek plaintiffs with an entitlement to benefits, not to funding, the Kinek plaintiffs should receive only benefits. We disagree. Section 10.2 merely provides that, in the event of a spinoff, participants in the G & W Plan become entitled to receive that which they would have been entitled to receive in the event of an actual termination. Section 3.1, on the other hand, dictates that, upon termination, participants in the spun off portion of the plan become entitled to have their vested pension benefits fully funded. Participants in the spun off plan thus have a contractual right to full funding of their vested benefits

upon the spinoff. That they may have a right personally to receive only benefits does not diminish this contractual right to full funding, which right is satisfied when the spun off plan is fully funded.

■■■■ Second, the award is not inconsistent with either the Kinek plaintiffs' standing or the PBGC's standing. As to the PBGC, we agree with the district court's determination that, pursuant to ERISA section 4042(d)(1)(B)(ii), 29 U.S.C. § 1342(d)(1)(B)(ii), the PBGC, as trustee of the NJ Zinc Plan, has the authority "to collect for the plan *any* amounts due the plan." 29 U.S.C. § 1342(d)(1)(B)(ii) (emphasis added). This grant of authority does not limit the PBGC to collecting amounts due under contracts to which the plan is a party, as the defendants contend, citing *Pension Benefit Guaranty Corp. v. Beadle*, 685 F.Supp. 628 (E.D.Mich.1988). In *Beadle*, the district court sustained the PBGC's power to collect amounts due under such a contract. *Id.* at 631. In light of the unmistakably broad language of section 4042(d)(1)(B)(ii), however, we decline to construe the factual circumstances presented in *Beadle* as setting the high water mark with respect to the PBGC's authority. *See also Kinek I*, 720 F.Supp. at 279–80.

■■■■ Next, the defendants contend that the Kinek plaintiffs have no standing to seek full funding of the NJ Zinc Plan. ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), one of the provisions under which the Kinek plaintiffs sued, provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In the prayer for relief in their amended complaint, the Kinek plaintiffs sought *inter alia*

> [an] order [that] defendants G & W and the G & W Plan ... comply with the terms of the collectively-bargained pension agreement ... by transferring to the NJ Zinc Plan an additional amount of assets that, together with the amount previously transferred, is sufficient to fully fund on a sound actuarial basis the benefits that had vested under the terms of the G & W Plan as of September 30, 1981.

This prayer for relief establishes that the Kinek plaintiffs sought to enforce *their* right under the G & W Plan to have their vested benefits fully funded at the time of the spinoff. Pursuant to ERISA section 502(a)(1)(B), the Kinek plaintiffs have standing to seek to enforce this right. The award ordered by the district court is, therefore, consistent with the Kinek plaintiffs' standing.[6]

We thus conclude that the district court did not abuse its discretion in formulating the award.

### III. *Prejudgment Interest*

■■■■ On cross-appeal, the PBGC contends that the district court abused its discretion

---

6. To the extent that this basis for the Kinek plaintiffs' standing differs from the basis identified by the district court, *see Kinek I*, 720 F.Supp. at 278–79, the difference is of no import. It is sufficient that the Kinek plaintiffs had standing to seek the relief that was awarded, that the basis for finding standing derives from the Kinek plaintiffs' complaint, and that the Kinek plaintiffs' theory of the case has not changed. Indeed, in conducting our standing inquiry, we must refer to the party's complaint. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 594 (2d Cir.1993). Moreover, as we read the district court's opinion in this case, it is clear that, throughout this litigation, the plaintiffs' theory of the case has been "that G & W breached its contractual obligations under the G & W Plan to fund vested benefits fully in the event of a ... 'spin-off.'" *Kinek I*, 720 F.Supp. at 278.

In any case, we find it doubtful that an award of damages to plaintiff A could be inconsistent with the standing of plaintiff B. Even if plaintiff B had no standing at all, the award to plaintiff A would be upheld, in the face of a standing challenge, as long as it were consistent with plaintiff A's standing. *Cf. Kinek IV*, 1993 WL 229012, at 2, 1993 U.S.Dist. LEXIS 8478, at *4 ("'[a]t most, the result accomplished by the ... judgment is the same as if the Kinek plaintiffs had never been a party to the lawsuit and instead the action had been brought by the PBGC alone'").

by awarding prejudgment interest between September 30, 1981 and January 1, 1983 (the pre-termination period) at a rate lower than the NJ Zinc Plan actually earned during that period. For the reasons stated below, we are not persuaded.

The district court exercised its discretion to award prejudgment interest, commencing on the date of the spinoff, on the basis of its determination that such an award was necessary to make the plaintiffs whole. *Kinek III,* 817 F.Supp. at 366. The district court then selected the rate of 9.5 percent, which was based on the effective discount rate that was used to calculate the funding shortfall, as adequate to compensate the plaintiffs fully without creating an overfunding of the NJ Zinc Plan. The court thereby rejected the plaintiffs' request for a prejudgment interest rate equal to one of several "market" rates. *Id.* at 366–67.

The PBGC does not contend that the rate of interest imposed by the district court, as applied to the pre-termination period, is unreasonable or that it will result in insufficient funding of the Kinek plaintiffs' vested benefits. The PBGC nonetheless asserts that, for two principal reasons, the prejudgment interest award was an abuse of discretion.

First, the PBGC argues that the relevant case law required the district court to award prejudgment interest at a rate equivalent to the rate earned by the NJ Zinc Plan, citing, for example, *Diduck v. Kaszycki & Sons Contractors,* 974 F.2d 270 (2d Cir.1992); *Donovan v. Bierwirth,* 754 F.2d 1049 (2d Cir.1985); *Dardaganis v. Grace Capital Inc.,* 684 F.Supp. 1196 (S.D.N.Y.1988), *aff'd in part and vacated in part on other grounds,* 889 F.2d 1237 (2d Cir.1989). We disagree.

The PBGC relies on breach of fiduciary duty cases under ERISA, in which the goals of the remedy are "to make good to [the] plan any losses to the plan resulting from each such breach," 29 U.S.C. § 1109(a), and to "serve[ ] as compensation for the use of money withheld," *Diduck,* 974 F.2d at 286;

*see also Donovan,* 754 F.2d at 1055–56; *Dardaganis,* 684 F.Supp. at 1199. In our view, the cited cases do not stand for the inflexible proposition that district courts in all ERISA cases must award prejudgment interest that approximates the actual rate of return, regardless of other equitable considerations. Although such a rule might be generally useful in the ERISA breach of fiduciary duty cases, and particularly in cases like *Diduck* where the plan trustee fraudulently breached his fiduciary duty, that rule is not necessarily universally applicable. Indeed, in *Wickham Contracting v. Local Union No. 3, IBEW,* 955 F.2d 831, 833–35 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992), we discussed general principles relating to prejudgment interest and noted that "[a]wards of prejudgment interest must not result in over-compensation of the plaintiff." *Id.* at 834. In this case, which involved a breach of contract rather than a breach of fiduciary duty, the district court determined that using the actual earned rate of interest would result in a "windfall" to the plaintiffs and that the lower discount rate would be adequate to accomplish the full funding of the Kinek plaintiffs' vested benefits. *Kinek III,* 817 F.Supp. at 367. Consideration of these equitable factors was entirely proper and constituted no abuse of discretion.

Second, the PBGC contends that the district court improperly considered whether the prejudgment interest award would create a windfall for the plaintiffs. The PBGC contends that, for purposes of prejudgment interest, the pre-termination period in this case should be treated differently from the post-termination period: the former should be governed by the actual, earned rate of interest, and the latter should be governed by an estimated interest rate. By "blending" the proper rates of interest for the pre-termination and post-termination periods in an attempt to avoid an overfunding or "windfall" during the post-termination period, the

PBGC asserts, the district court deprived the PBGC of its statutorily created opportunity to benefit from an overfunding that occurs in the event of an unexpected increase in the value of plan assets in the post-termination period. Again, we disagree.

■ At the outset, ERISA section 4044(c), 29 U.S.C. § 1344(c), which allegedly creates the PBGC's opportunity to profit from overfunding, does not necessarily have the meaning that the PBGC attributes to it.[7] The PBGC asserts on appeal that it alone bears the risk of an increase or decrease in the value of plan assets after termination and, therefore, that it alone is entitled to retain any excess in the event of an increase. Section 4044(c) provides:

> Any increase or decrease in the value of the assets of a single-employer plan occurring during the period beginning on the later of (1) the date a trustee is appointed under section 1342(b) of this title or (2) the date on which the plan is terminated is to be allocated between the plan and the [PBGC].... Any increase or decrease in the value of the assets of a single-employer plan occurring after the date on which the plan is terminated shall be credited to, or suffered by, the [PBGC].

29 U.S.C. § 1344(c). In this case, where the plan terminated and the PBGC became trustee of the plan on January 1, 1983, *see Kinek I*, 720 F.Supp. at 278, the first sentence of section 4044(c) seems to provide that the risk of an increase or decrease in the value of plan assets in the post-termination period is shared by the PBGC and NJ Zinc Plan. *See also Beadle*, 685 F.Supp. at 632. The first and second sentences of section 4044(c) thus appear to be contradictory. Without resolving which portion of section 4044(c), the first sentence or the second sentence, would govern in this case, we note that the district court would not have committed an abuse of discretion even if the second sentence governed and the PBGC were entitled to retain all excess funding generated in the post-termination period. We are doubtful that an award of prejudgment interest could permissibly be used as a substitute for that excess funding. Indeed, such an award would constitute an award of lost profits for the PBGC. *Cf. Pension Benefit Guaranty Corp. v. Solmsen*, 743 F.Supp. 125, 127 (E.D.N.Y.1990) ("the court only has discretion under [29 U.S.C.] § 1109(a) [ERISA provision prescribing liability for breach of fiduciary duty] to compensate the Plan, not the [PBGC], for lost investment opportunities caused by the breach").

The judgment is affirmed.

---

7. Although the PBGC would normally be entitled to deference in its reasonable interpretation of this provision, *see LTV Corp.*, 496 U.S. at 647, 110 S.Ct. at 2676; *Chevron*, 467 U.S. at 842–44, 104 S.Ct. at 2781–83, the PBGC has apparently been inconsistent in its interpretation of section 4044(c), 29 U.S.C. § 1344(c). *Compare Beadle*, 685 F.Supp. at 632 ("[a]s the PBGC correctly observes, [section 4044(c)] allocates post-termination gains or losses between the PBGC and the plan sponsor/employer or participants"). Accordingly, the PBGC may not be entitled to deference with respect to section 4044(c). *Cf. Estate of Cowart v. Nicklos Drilling Co.*, —— U.S. ——, ——— ——, ——— ———, 112 S.Ct. 2589, 2594–95, 2596–97, 120 L.Ed.2d 379 (1992) (suggesting that courts should defer to the reasonable interpretation of the Longshore and Harbor Workers' Compensation Act offered by the Director of the Office of Workers' Compensation Programs only if the Director's interpretation has been consistent over time). We need not decide, however, whether the PBGC is entitled to deference because its interpretation of section 4044(c) in this case is not reasonable because it does not account in any way for the first, contradictory sentence of that provision. The PBGC's interpretation of section 4044(c) would, therefore, fail our scrutiny on that basis alone.